Pennsylvania Public Utility Commission *v.*
W. J. Dillner Transfer Company,
Appellant.

Argued September 18, 1959. Before GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ. (RHODES, P. J., and HIRT, J., absent).

*G. Thomas Miller,* with him *Ernie Adamson,* and *Bailey, Pearson, Miller & Bolton,* for appellant.

*Morris Mindlin,* Assistant Counsel, with him *Thomas M. Kerrigan,* Counsel, for Pennsylvania Public Utility Commission, appellee.

OPINION BY ERVIN, J., November 11, 1959:

This is an appeal from an order of the Pennsylvania Public Utility Commission sustaining its own complaint and directing that W. J. Dillner Transfer Company "cease and desist transportation of property for compensation between points in Pennsylvania in any manner or between any points other than as heretofore authorized by certificate of Pennsylvania Public Utility Commission.", and further directing Dillner to pay to the Commonwealth of Pennsylvania "a penalty of $5,000 for violations of the Public Utility Law as established and found in the instant complaint." The commission found 1,240 violations. Dillner, in effect, admitted transporting the property but asserted it had a right to do so under certificates granted to it by the commission. It complains of the fact that the commission did not prove the type of equipment used but contented itself with showing the kind of property hauled. The commission, on the other hand, took the position that Dillner did not have the right to haul the kind of property which the proofs show it did haul between the places where it was hauled.

In order to determine this controversy it will be necessary to refer in some detail to the certificate rights heretofore granted to Dillner and to the history of the transactions between Dillner and the commission.

On November 23, 1942, at Application Docket No. 61744, Folder 2, Dillner was granted the following authority: "To transport, as a Class D carrier, property between points in the County of Allegheny;

"To transport, as a Class C carrier, property from points in said county to other points in Pennsylvania;

"To transport, as a Class D carrier, beer, ale, and other brewed products of the Pittsburgh Brewing Com-

pany in the City of Pittsburgh, and Fort Pitt Brewing Company in the Borough of Sharpsburg, Allegheny County, from the said breweries in the said city and borough to points within two hundred (200) miles by the usually traveled highways of the limits of the respective city and borough, and the return of empty containers to the said breweries;

"subject to the following conditions, inter alia:

"SECOND: That in the transportation of merchandise from retail stores to consumers within the City of Pittsburgh and the County of Allegheny, the certificate holder is limited and restricted to shipments where the goods of only one shipper will be transported on a truck at any one time.

"THIRD: That the rights, powers and privileges hereby granted with respect to the transportation of goods from points within the City of Pittsburgh and within the County of Allegheny to points outside of Allegheny County are limited to truckload shipments of two thousand pounds or more in weight from one consignor to one consignee, and to points within fifty (50) miles by the usually traveled highways of the City-County Building, Pittsburgh; provided, however, that this restriction shall not apply to the transportation of household goods and office equipment in use."

By order dated May 19, 1947, at Application Docket No. 61744, Folder 3, Dillner was granted the following authority: "To transport, as a Class C carrier, property in shipments weighing five thousand (5,000) pounds or more, which because of its size or weight requires special handling and the use of special equipment such as trucks having winches or special equipment attached, or trucks of special body construction, or pole trailers, or drop-frame trailers from points in the City of Pittsburgh, Allegheny County, and within a radius of fifty (50) miles thereof, to other points in Pennsylvania;"

On December 8, 1952, at Application Docket No. 61744, Folder 4, Dillner was granted the following authority: "To transport, as a Class D carrier, iron and steel, iron and steel articles and products and such materials and supplies and equipment used or useful in the production, assembly and distribution of iron and steel and iron and steel articles and products from the property of the United States Steel Company located in Falls Township, Bucks County, to points within an airline distance of one hundred fifty (150) miles of said property, and vice versa;

"To transport, as a Class D carrier, iron and steel, and iron and steel articles and products and such materials and supplies and equipment used or useful in the production, assembly and distribution of iron and steel and iron and steel articles and products, which because of their size and weight require special handling and the use of special equipment such as trucks having winches or special equipment attached, or trucks of special body construction, or pole trailers, or drop-frame trailers, from the property of the United States Steel Company located in Falls Township, Bucks County, to points on and east of Highway Route 219, and vice versa;

"subject to the following condition:

"That no right, power or privilege is granted to transport liquids in bulk in tank trucks."

On January 3, 1956, at Application Docket No. 61744, Folder 5, Dillner was granted the following authority: "To transport, as a Class D Carrier, for the United States Steel Corporation and its wholly owned subsidiaries, by means of flat-bed trucks and/or trailer, iron and steel and iron and steel articles and products, in pieces, packages or bundles weighing one thousand (1,000) pounds or more each, from points in the County of Allegheny to the City of Philadelphia and points

within an airline distance of thirty-five (35) miles of the limits of said city, and vice versa;

"To transport, as a Class D Carrier, by means of flat-bed and/or trailers, refractory products, on pallets, from the City of Philadelphia and points within an airline distance of twenty (20) miles of the limits of said city to points in the County of Allegheny;"

On January 16, 1950, at Docket No. A.61744, Folder 3, the commission instituted a rule against Dillner for violation of its certificate. This action related to the transportation of 21 coils of steel from the Carnegie-Illinois Steel Corporation, at Dravosburg, Pennsylvania, to the Enamel Metal Strip Corporation, Allentown, Pennsylvania, and the transportation of sheet steel from Dravosburg to Budd Company in Philadelphia, Pennsylvania. The coils of steel were approximately 36 inches wide and 36 inches in diameter and weighed 2,300 pounds and were blocked with ordinary 8-inch wooden blocks curved to fit the coil. The sheet steel was in bundles weighing 4,800 to 11,000 pounds and they were secured by what is commonly known as chain binders, the chains being drawn through the holes along the sides where stake racks are usually set. In this case the commission reviewed the history of Dillner's rights at Folder 3 and concluded as follows: "The type of service offered by and the rights granted to the so-called 'heavy-haulers' has been limited to the transportation of extremely heavy or bulky machinery, equipment or materials such as are commonly used in or in conjunction with construction projects. The transportation of such property is a specialized service, which requires for its efficient conduct inherently special vehicular equipment. The temporary or permanent attachment of blocks, chocks or chains to an otherwise ordinary truck or trailer does not transform it into such special equipment. . . .

"All of these factors were considered when respondent was granted heavy-hauling rights from Pittsburgh and a radius of 50 miles to any point in Pennsylvania. It would be fantastic to conclude on the record made in respondent's application proceeding that these rights should now be construed so comprehensively as to permit respondent to establish a regular service for the transportation of iron and steel products in general between specific points over definite routes anywhere in this vast territory."

We affirmed this order in *W. J. Dillner Transfer Co. v. Pa. P. U. C. (No. 2)*, 175 Pa. Superior Ct. 472, 107 A. 2d 164. Further review was denied by the Supreme Courts of Pennsylvania and the United States. In our opinion, at page 479, we said: "The record clearly discloses that the transportation of the coils of steel and the sheet steel did not require special handling and the use of special equipment, and that therefore it was not within the scope of Dillner's certificated rights at A.61744, Folder 3, but rather within the requested authority which was denied by the Commission."

On June 20, 1950, at Complaint Docket No. 15013, the Lancaster Transportation Company filed a complaint against Dillner, charging it with transporting a load of nails from Rankin, Pennsylvania, to Lancaster, Pennsylvania, in violation of Dillner's rights at Folder 3. Again the commission reviewed the history of Dillner's rights at its Folders 2 and 3, and in its order said: "Nothing more than a cursory examination of the original Dillner applications and records is required in order to reach the conclusion that Dillner never sought, was never granted, and therefore, does not now have the right to transport general property from Allegheny County to any point in Pennsylvania. . . . On August 13, 1945, the respondent filed

an application at A.61744, F. 3 for the additional right to provide transportation service in the field of 'heavy-hauling' from Pittsburgh and points within 50 miles to other points in Pennsylvania and 'also' the right to transport other property including metal pipe, plates, sheets, etc., which it stated did not require the special handling and equipment associated with 'heavy-hauling'. . . . If, as respondent now contends, its original certificate of public convenience authorized transportation of property generally from Pittsburgh and points in Allegheny County to other points in Pennsylvania, the request for the right to transport metal pipe, plates, sheets, etc., was as superfluous as the beer application in 1935. . . . By order dated May 20, 1947, we approved the 'heavy hauling' portion of the application and further specifically directed 'that the application insofar as it refers to all other transportation be and is hereby refused for lack of necessity. . . . Except for the transportation of beer and service in the fields of household moving and 'heavy hauling' the respondent's radius of operation under the certificates of public convenience here considered is and always has been limited to points within 50 miles of the City-County Building, Pittsburgh." On appeal the order of the commission was affirmed in *W. J. Dillner Transfer Co. v. Pa. P. U. C. (No. 1),* 175 Pa. Superior Ct. 461, 107 A. 2d 159. Review was denied by the Supreme Courts of Pennsylvania and the United States.

On February 7, 1955 the commission again instituted a complaint against Dillner for unauthorized transportation. This complaint involved 65 alleged illegal shipments, including transportation of sheet steel from the Irwin works to Budd Company in Philadelphia, tinplate from the Irwin works to Philadelphia Tinplate Company in Philadelphia, and brick from E. J. Lavino & Company, Montgomery County, to steel

companies in the Pittsburgh area. The balance of the shipments included drums of plastic and bonding mortar, skids of chrome ore and bundles of zinc base alloy ingots between the Pittsburgh-Philadelphia areas. Again the commission reviewed Dillner's rights at Folder 3 and said: "It is apparent that the transportation described is beyond the scope of respondent's 'heavy hauling' authority and beyond the territorial limits of respondent's right to transport general property in the 50-mile radius of Pittsburgh." The commission fined Dillner $700.00 for 14 days of violations.

On August 17, 1954 Dillner filed application for additional rights, which eventuated in the grant of authority now contained at Commission Docket No. A.61744, Folder 5, hereinbefore referred to. In the commission's order of September 26, 1955, Dillner's rights at the aforesaid Folders 2, 3 and 4 were again reviewed, including the proceedings hereinbefore mentioned. The rights sought at Folder 5 consisted in a broad substitution of rights for those at Folder 2, which would have included broad rights for the transportation of steel and steel products and refractory products between points in the County of Allegheny and from points in the County of Allegheny to other points in Pennsylvania. The rights were granted in a limited scope, as will be apparent from an inspection of the Folder 5 authority hereinbefore set forth.

We think it is clear from the above that Dillner knew or should have known that iron and steel and iron and steel articles, such as steel coils, bars, plates and sheets, were not within its heavy hauling rights authorized in Folder 3. Nor could Dillner have honestly believed that refractory products were comprehended within its heavy hauling authority at Folder 3, in addition to their specific and limited inclusion in Folder 5. From an inspection of this record we

are of the opinion that Dillner transported a great number of the commodities and property which it had been told on numerous occasions were not included within its heavy hauling rights at Folder 3. The mere fact that the commission did not show the type of equipment used to haul the commodities is immaterial. The record shows that Dillner also carried a number of commodities not so precisely and repeatedly dealt with in prior proceedings but no less clearly unauthorized, such as display material, siding, caulking material, television sets and teletypes. The record also shows that during the period studied from July 1, 1957 to March 31, 1958, Dillner provided these services to and from points in most of the counties of the Commonwealth. Its conduct cannot be condoned and its flagrant disregard of the orders of the commission cannot be excused.

The commission's holdings with respect to heavy hauling rights have been clear and consistent. In addition to the *Dillner* cases hereinbefore cited, see *Weston Hauling, Inc. v. Pa. P. U. C.*, 185 Pa. Superior Ct. 503, 508, 138 A. 2d 286, where Judge WRIGHT quoted with approval the following language of the commission: " 'We have no doubt that "materials of all kinds" which may be transported by authority of respondent's certificate of public convenience must be in the class of or related to "heavy industrial machinery and contractors' equipment" and not materials or property in an unrestricted sense. The grant contemplated a specialized service for the transportation of heavy industrial machinery and contractors' equipment such as the specifically mentioned tractors, rollers, concrete mixers and power shovels. In this connection it is to be noted that the type of equipment to be used in the authorized service is "heavy hauling equipment" which of itself classifies and limits the nature of the property to

be transported. Sheet steel, coil steel, lumber, castings, acid, pipe and fire brick do not require "heavy hauling equipment" for their efficient transportation. . . .

" 'From the foregoing, it is clear that respondent's certificate only authorizes transportation in the field of "heavy hauling". It does not and never was intended to authorize transportation of property in general.' "

See also *Mac-Rod Transport Co. v. Pa. P. U. C.*, 190 Pa. Superior Ct. 174, 177, 153 A. 2d 501, where Judge HIRT quoted with approval the following language of the commission: " ' heavy hauling certificates authorize only the transportation of extremely heavy or bulky machinery, equipment or materials such as are commonly used in or in conjunction with construction projects. They do not authorize the transportation of sheet steel, coil steel, steel bars and similar *iron and steel commodities.*' " In that case the president of the appellant company testified that for the transportation of steel coils " 'he would use flat-bed trailers equipped with bulkheads, side pockets, and coil racks or cradles, with the coils secured by chains and binders and, where needed, covered with tarpaulins.' " He also stated that in his opinion those items constituted "special equipment." On the other hand, there was testimony by experts that these items did not constitute special equipment in the transportation of steel coils. The commission found that those items did not constitute special equipment and we affirmed its order. It was further said, at page 178: "It was for the Commission to interpret the extent and nature of certificates of public convenience issued by it. Because of the intricacies of the technical problems involved the Commission is especially qualified to speak with authority in construing the original grant. And while the Commission's interpretation of its orders is

not conclusive on us, we, in the absence of compelling reasons, will not set aside the action of the Commission based upon its conclusion as to the extent of certificated rights."

In the present case the record indicates that there were 542 shipments of steel coils and 89 shipments of steel plates, notwithstanding the commission had on a number of occasions told Dillner that it had no right to transport iron and steel commodities. The record will also reveal that Dillner transported 193 shipments of refractory products, which it had clearly been told, in the order of the commission of January 30, 1956, it could not transport. See *Application of W. J. Dillner Transfer Co.,* 33 Pa. P. U. C. 472, 495.

Dillner also challenges the power of the commission to impose a fine. In its argument it refers to various sections of the Public Utility Law and then states that these sections did not authorize the commission to impose any penalties as a result of a complaint proceeding. This subject has heretofore received the consideration of our Court and we have decided otherwise. In *York T. & T. Co. v. Pa. P. U. C.,* 181 Pa. Superior Ct. 11, 28, 121 A. 2d 605, Judge HIRT, speaking for the majority, said: "Under §1301, supra, the Common Pleas of Dauphin County is given jurisdiction, to the exclusion of all other courts, but only to *recover* the penalties after they have been imposed by the Commission." See also *Pa. P. U. C. v. Gornish,* 134 Pa. Superior Ct. 565, 573, 4 A. 2d 569, where we affirmed the imposition of a penalty by the commission under §1301(b), 66 PS §1491. We have given reconsideration to the *York T. & T. Co.* case and have concluded that it was correctly decided. The relative language of §1301(a) of the Public Utility Law, 66 PS §1491, is as follows: "If any public utility shall violate any of the provisions of this act, or shall do any mat-

ter or thing herein prohibited; or shall fail, omit, neglect, or refuse to perform any duty enjoined upon it by this act; or shall fail, omit, neglect or refuse to obey, observe, and comply with any regulation or final direction, requirement, determination or order made by the commission, or any order of the commission prescribing temporary rates in any rate proceeding; or to comply with any final judgment, order or decree made by any court, such public utility, for such violation, omission, failure, neglect, or refusal, shall forfeit and pay to the Commonwealth of Pennsylvania the sum of fifty dollars; *to be recovered* by an action of assumpsit instituted in the name of the Commonwealth of Pennsylvania, in the court of common pleas of Dauphin County, which court is hereby clothed with exclusive jurisdiction throughout the Commonwealth to hear and determine all such actions." (Emphasis supplied) As we have said on many occasions, the commission and its staff are specially trained to investigate complaints of the nature here involved. They can, as they did in this case, hold hearings in the City of Pittsburgh, where the main office of Dillner is located, which the Dauphin County Court could not do. It would be an inconvenience to make the witnesses travel great distances to Dauphin County in such matters. True it is that the commission does not have the power to collect a penalty such as the court of common pleas does have. It might revoke a certificate but this procedure also might be undesirable. We believe that the legislature, by the language used in §1301(a), merely intended to set up a workable procedure for the collection of a fine once it had been imposed by the commission. Dillner also argues that the commission has not shown "any basis or computation for this fine." The commission found 1,240 violations. These violations occurred on 193 separate days. Whether the commis-

sion might have imposed a penalty at the rate of $50.00 for each violation or for each day of violation, it is certain that the fine of $5,000.00 is well within the limitations of the act. In *Pa. P. U. C. v. Gornish,* supra, at page 573, we said: "The penalty was imposed in accordance with section 1301(b) (66 PS §1491) of the Public Utility Law. This section imposes a penalty of fifty dollars for 'each and every day's continuance in the violation of any regulation.' The evidence was sufficient to sustain a finding that those violations covered more than sixty days."

Dillner also argues that it was entitled to a trial by jury. Section 1110 of the Public Utility Law, 66 PS §1440, provides for trial by jury of any issue of fact raised in the proceedings before the commission "where such right is secured either by the Constitution of the Commonwealth or of the United States. . . ." It has been determined, however, by our Supreme Court that matters within the jurisdiction of the commission must first be determined by it, in every instance, before the courts will adjudge any phase of the controversy: *St. Clair Boro. v. Tamaqua & Pottsville Electric Ry. Co.,* 259 Pa. 462, 468, 103 A. 287. See also *Bellevue Boro. v. Ohio Valley Water Co.,* 245 Pa. 114, 91 A. 236. The Sixth and Seventh Amendments to the United States Constitution and art. I, §6 of the Pennsylvania Constitution of 1874 only preserve the right to trial by jury in those cases where it existed at the time the constitution was adopted. The matters committed by the legislature to the Public Utility Commission were then nonexistent. Hence no right to jury trial existed which could be preserved. The legislature may withhold trial by jury from new judicial proceedings created by statute and clothed with no common law jurisdiction: *Pa. Publications, Inc. v. Pa. P. U. C.,* 152 Pa. Superior Ct. 279, 290, 291,

32 A. 2d 40. The late Judge HARGEST, in *Matter of Certain Moneys in the Custody of Harrisburg Gas Co.,* 48 Dauphin C. R. 284, 298, disposed of the same question as follows: "It is contended that no jury trial is afforded. Due process does not require a jury trial in all classes of actions. The constitutional provision that 'trial by jury shall be as heretofore, and the right thereof remain inviolate,' means that in all proceedings where a jury trial was demandable at the time of the adoption of the Constitution it could not be taken away by statute, but where new proceedings are established by law the remedy afforded must not necessarily be a jury trial if there is a proper right of review before a regularly constituted judicial tribunal." See also: *Byers and Davis v. Com.,* 42 Pa. 89, 94, 95, 96; *Rhines v. Clark,* 51 Pa. 96, 101.

We have carefully reviewed this record and do not find any errors of law, lack of evidence to support the determination of the commission or violation of constitutional rights. The order of the commission is affirmed.