546 A.2d 1217

**Boyd MURPHY, Appellee,**

v.

**CARTEX CORPORATION, Appellant.**

Superior Court of Pennsylvania.

Argued March 9, 1988.

Filed Aug. 24, 1988.

182

John C. Wright, Jr., Philadelphia, for appellant.

Albert L. Blackman, Jr., Doylestown, for appellee.

Before ROWLEY, WIEAND and MONTEMURO, JJ.

MONTEMURO, Judge:

This case concerns the interpretation and application of several provisions of the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.S.A. § 951 *et seq.* The appellee, Mr. Boyd Murphy, was hired by the appellant, Cartex Corporation, on July 10, 1979. Murphy's position with Cartex was that of a urethane utility man on the production line in Cartex's Doylestown plant.[1] When Murphy was initially hired by Cartex, he did not reveal the fact that he suffered from epilepsy. However, within a few months Cartex became apprised of Murphy's condition when Murphy suffered a seizure at work. Following this initial seizure, Cartex suspended Murphy and requested that he obtain the opinion of his physician concerning his physical ability to work for Cartex.[2] After receipt of the physician's letter, it is undisputed that Cartex offered to move Murphy from the

1. Cartex's Doylestown plant is involved in the manufacture of urethane foam products such as automobile seats and cushions for office furniture. N.T. July 14, 1986 at 39. On the production line, the urethane foam material is poured into molds and the molds are sent through an oven. *Id.* at 40. When the mold exits the oven, its temperature is about two hundred and seventy-five degrees. *Id.* As a mold exits the oven, an employee in the position of a "stripper" opens the mold. The urethane utility man then completes the opening of the mold and breaks off any excess foam on the mold. *Id.* at 9 and at 40.

2. The pertinent portions of the letter which Cartex received from Murphy's physician are as follows:

At your request, Boyd Murphy visited me in the office on 10–10–79. In reviewing his chart, he apparently has had a seizure disorder for many, many years, but in recent years has been in excellent control ... [I]t would appear that his recent seizure at your plant was the first he had had in several years.

We discussed briefly the conditions under which he works. I am sure you would agree that his job is a very physically demanding one. I really cannot say whether in fact these factors were at work in prompting his first seizure in several years. I think it would be reasonable that his time on break at 9 and 12 a.m. be extended from 15 to 30 minutes, and Mr. Murphy has indicated that he would be more than willing to come in to work 15 minutes early and leave 15 minutes late, in order to compensate for that time lost on the job. We are checking the levels of medication in his blood to see if it is sufficient, but as he had been without seizures for many years prior to his recent episode, I really do not think his medication should be changed at this time.

N.T. July 14, 1986 at 27.

production line into a position in the finishing department, where Murphy would have been able to have thirty minute break periods as opposed to the fifteen minute break periods afforded to production line employees. Murphy refused a position in the finishing department because it involved a lower salary.

Following Murphy's initial seizure, Cartex continued to employ Murphy on the production line until March of 1982. During the thirty-two months that Murphy was employed by Cartex, he suffered approximately fifteen seizures while on the job. N.T. July 14, 1986 at 23.[3] Unfortunately, in February of 1982, Murphy suffered a seizure while working which resulted in serious burns to his hands. As a result, on March 15, 1982, Cartex terminated Murphy's employment, advising him that his epilepsy created an unacceptable risk of physical injury to himself and to his fellow workers.

In June of 1983, Murphy filed suit against Cartex. First, Murphy alleged that Cartex had breached the terms of its employment contract with Murphy by failing to allow him to exercise his "bumping privilege" as set forth in the Cartex employee handbook:

Job Bumping:

(6) If for a relatively permanent medical reason, as determined by the Company physician, full time working employees are unable to perform the required duties of the job and disqualify themselves, they shall be allowed a special bumping privilege, provided the job they wish to bump into does not contain like or similar conditions to those causing the difficulty.

Brief for Appellant, Exhibit 3. As a second cause of action, Murphy alleged that Cartex had violated the Pennsylvania Human Relations Act by denying him the bumping privilege as set forth above before terminating his employment. Murphy properly requested a jury trial pursuant to Pa.R.

---

3. During this time, Murphy also suffered several seizures while at home and he also suffered a seizure while operating a car which resulted in an auto accident. N.T. July 14, 1986 at 23.

C.P. 1007.1(b). Cartex's motion for summary judgment on both counts of Murphy's complaint was denied by the trial court on May 6, 1986.

The jury trial commenced on July 14, 1986. Initially, the jury was provided with a view of the Doylestown plant. Thereafter, Murphy testified. Part of Murphy's testimony established his belief that he could have safely worked in other departments of the Cartex Doylestown plant. Specifically, Murphy testified that he believed that he could have safely worked in the finishing department, the warehouse, and as a janitor. N.T. July 14, 1986 at 15. Murphy also read the above quoted provision of the Cartex employee handbook to the jury and testified that he was never given the opportunity to use the special bumping privilege. *Id.* at 18–19. Following the close of Murphy's testimony, Cartex moved for the dismissal of the breach of contract claim. Cartex also requested the court to excuse the jury if it dismissed the breach of contract claim, contending that the PHRA does not provide for trial by jury. The trial court dismissed the breach of contract claim, but refused to excuse the jury. After Cartex presented its case, the jury awarded Murphy $16,812.00, representing his lost wages without interest.[4] Cartex filed a timely motion for post-trial relief, requesting a judgment n.o.v. or a new trial. The trial court denied the post-trial relief requested by Cartex.

Cartex has presented the following issues to this Court for review:

1. Did the trial court err in finding that the verdict of the jury that Cartex had violated the PHRA was supported by sufficient evidence?

---

**4.** Cartex presented the testimony of several Cartex employees who had been involved in the supervision of Murphy. Ralph Dowdell, Director of Personnel for Cartex Corporation, testified that, following Murphy's serious hand injuries, he had considered other job opportunities for Murphy within the Doylestown plant and had determined that none of them assured enough safety to Murphy or to Murphy's fellow employees. N.T. July 14, 1986 at 49. None of Cartex's witnesses denied the fact that Murphy had not been allowed to try to use the special bumping privilege.

2. Did the trial court err in refusing to dismiss the jury following the dismissal of the breach of contract claim?

3. Did the trial court err in refusing to grant a new trial on the grounds that the jury was misled when it was *not* informed that the breach of contract claim had been dismissed?

4. Did the trial court err when it refused to grant a continuance to await the arrival of an expert witness for Cartex?

■ We will begin by addressing the third issue because it is upon this issue which we find reversible error. We recognize that a trial judge "has wide latitude in charging the jury as long as he fully conveys to the jury the law of the case." *Jackson v. Spagnola,* 349 Pa.Super. 471, 480–481, 503 A.2d 944, 949 (1986). In *Olson v. Dietz,* 347 Pa.Super. 1, 500 A.2d 125 (1985), this Court stated that "[i]n evaluating a claim of erroneous instructions to the jury, we must analyze the court's charge in its entirety.... If a legally valid requested point for charge is sufficiently and adequately covered in the trial court's instructions to the jury, it is appropriate to deny the request." *Id.,* 347 Pa.Superior Ct. at 6, 500 A.2d at 128. Cartex excepted to the failure of the trial court to explain to the jury that the breach of contract claim had been dismissed, and the following exchange took place on the record:

THE COURT: Why charge them?

MR. WRIGHT: The jury doesn't know the handbook cannot be a contract and they can't base their verdict on that part of it.

THE COURT: I did not charge them on that, did I?

MR. WRIGHT: But don't you think you should explain to them it has been dismissed and has to be based solely on the Act?

THE COURT: I said that is [sic] the only thing they had to consider was the Pennsylvania Human Relations Act. What else can I say?

MR. WRIGHT: 1 would except to that failure to explain that Count 1 had been dismissed.

THE COURT: All right.

N.T. July 15, 1986 at 157–158. It is undisputed that when the jury retired to deliberate, they were permitted to take a copy of the Cartex employee handbook with them.

Section 955 of the PHRA provides as follows:

It shall be unlawful discriminatory practice . . .

(a) For any employer because of . . . the non-job related handicap or disability of any individual to refuse to hire or employ, or to bar or to discharge from employment such individual, or to otherwise discriminate against such individual with respect to compensation, hire, tenure, terms, conditions or *privileges of employment*, if the individual is the best able and most competent to perform the services required.

43 Pa.S.A. § 955(a) (emphasis added). The term non-job related handicap has been defined in the PHRA as "any handicap or disability which does not substantially interfere with the ability to perform the essential functions of employment which a handicapped person applies for, is engaged in or has been engaged in." 43 Pa.S.A. § 954(p). "A handicap or disability is not job-related merely because the job may pose a threat of harm to the employe or applicant with the handicap or disability unless the threat is one of demonstrable and serious harm." 16 Pa.Code § 44.4. "A handicap or disability may be job-related if placing the handicapped or disabled employe or applicant in the job would pose a demonstrable threat to the health and safety of others." *Id.*

There is no question that Murphy suffers from a handicap. Further, the parties do not dispute the fact that Murphy's handicap was job-related with respect to his job as a urethane utility man on the production line. Murphy has never contended that Cartex violated the PHRA merely by terminating his job on the production line. Instead, Murphy has alleged that Cartex violated the PHRA by denying him a "privilege of employment", that being the special bumping privilege contained in the Cartex employee handbook. 43 Pa.S.A. § 955(a). Simply stated, Murphy's

position is that Cartex committed an unlawful discriminatory practice by denying him the opportunity to bump into a different job within the Doylestown plant. Thus, the handbook bumping privilege was central to Murphy's cause of action in this case.[5]

At the beginning of this jury trial, Murphy's breach of contract claim, based solely upon the handbook bumping privilege, was part of Murphy's case. Following the opening statements of counsel, the jury was on notice that it was Murphy's position that Cartex had violated its *contractual* promise to provide Murphy with the special bumping privilege. During Murphy's testimony, he read the handbook provision to the jury and testified that the Cartex employee handbook "had the shop rules and different rules and regulations as to different things I could do as an employee of Cartex." N.T. July 14, 1986 at 13. Thereafter, the court dismissed the breach of contract claim and Cartex presented its first witness. However, the jury was not advised that it would no longer have to decide a contractual issue.

Mr. Ralph Dowdell, who testified first for Cartex, read to the jury the Equal Employment Opportunity Statement contained in the Cartex employee handbook. *Id.* at 43. Mr. Dowdell admitted on cross examination that he was familiar with the handbook's special bumping privilege and he agreed that Murphy had never been allowed to bump into another job at the Cartex plant. *Id.* at 62. Finally, when the jury received instructions from the trial court, the court explained in general terms the provisions of the PHRA and

5. Indeed, without the handbook bumping privilege, it is unlikely that Murphy could have maintained a cause of action under the PHRA. *See Carty v. Carlin,* 623 F.Supp. 1181 (D.C.Md.1985) (Postal Service was not required to reassign handicapped employee as a reasonable accommodation under the Rehabilitation Act [29 U.S.C.A. § 701 et seq.]; duty to reasonably accommodate only contemplated accommodation of a qualified handicapped employee's present position, not reassignment or transfer of the employee to a different job or position.) *See also Carter v. Tisch,* 822 F.2d 465 (4th Cir.1987); *Dancy v. Kline,* 639 F.Supp. 1076 (N.D.Ill.1986); *Alderson v. Postmaster General of United States,* 598 F.Supp. 49 (W.D.Okla.1984).

its accompanying regulations. The trial court delivered the following instructions to the jury:

You will recall that there was, to a marked degree, a dispute as to whether or not the plaintiff could, in fact, continue to perform work for the Cartex Corporation without doing harm to himself or to the safety and welfare of others.

The plaintiff testified that he believes that he could do certain work and that he could work in other phases than what he was working at. For instance, he points out, as I recall his testimony, but it is for you to recall, not me, that he could do janitorial work, using that as an illustration.

The representative of the defendant corporation, Mr. Dowdell, testified that this is not so, that they reviewed all of the jobs; *that while they agreed the manual, P-1, which you will take out with you, does provide for a bumping policy, and I think we all know what that is—someone with more seniority bumps someone else out of a job—* that even to allow the plaintiff to bump into another position, his condition was such that modification and accommodations were not available to permit him to work without imposing a threat of harm to himself and safety to himself and others and, therefore, as to this dispute, we are dealing with a question of credibility ...

N.T. July 15, 1986 at 150–151.

We are not only bound to review a jury charge in its entirety, as we have done in the case presently before us, but we must also analyze the charge "against the background of the evidence in the particular case, to determine whether or not error was committed and whether that error was prejudicial to the complaining party." *Reilly by Reilly v. Southeastern Pennsylvania Transportation Authority,* 507 Pa. 204, 231, 489 A.2d 1291, 1305 (1985). A fair reading of the jury charge, against the background of the way in which this trial progressed, convinces us that the trial court failed to adequately explain the issues involving these parties. As this trial began, the jury was presented with the

contention that Cartex Corporation had entered into a contract with Murphy to provide him with the special bumping privilege, and that the express terms of this contract were contained in the Cartex employee handbook. The idea that the employee handbook provisions amounted to binding contractual duties was reinforced by the trial testimony and by the contents of the trial court's charge to the jury. When the trial court refused to explain to the jury that the breach of contract claim had been dismissed, we have no way of knowing how the jury explained to themselves the fact that they were not asked to decide the contract issue. Although they may have guessed that the trial court had dismissed this claim, it is just as likely that the jury believed that Cartex had decided not to contest this claim. Indeed, the jury may have concluded that Cartex had decided to admit to breaching its contract with Murphy, and with this view of the situation, the jury may have then proceeded to determine Murphy's right to recover for an alleged violation of the PHRA. A jury charge must be "clear and precise and so couched as not to confuse the jury." *Dunlap v. Larkin,* 342 Pa.Super. 594, 604–605, 493 A.2d 750, 756 (1985) (quoting *Osterritter v. Holl,* 259 Pa.Super. 112, 117, 393 A.2d 742, 744 (1978)). In the particular facts of this case, and in view of the importance of the employee handbook provision in Murphy's cause of action under the PHRA, we find that the trial court erred in not explaining to the jury that the breach of contract claim had been completely dismissed from the case. We believe this omission by the trial court may have confused and misled the jury in such a way as to have been prejudicial to Cartex. Accordingly, we find it necessary to remand for a new trial.[6]

6. We do not express any opinion on the merits of Murphy's cause of action under the PHRA by our decision to remand in this case. Certainly, an employer may not deny an individual a privilege of employment because of epilepsy, if the individual's epilepsy qualifies as a non-job related handicap or disability under the PHRA, its regulations, and interpretative case law. We are not unmindful of the struggle which epileptics must often encounter in the workplace:

■ Based upon our disposition of the third issue in this appeal, we find it unnecessary to address the remaining issues which appellant has raised in this appeal. We recognize, however, that our appellate courts have not addressed the issue of whether there is a right to a jury trial in actions brought pursuant to the PHRA. We believe that this is an issue which may be raised upon remand of the instant case and, for this reason, we will address it.[7]

Whether there is a right to a jury trial in actions brought pursuant to the PHRA depends upon the proper interpretation of § 962(c) of the PHRA:

In cases involving a claim of discrimination, if a complainant invokes the procedures set forth in this act, the individual's right of action in the courts of the Common-

Epileptics are ineligible for "hazardous" jobs in the federal civil service unless they have been seizure-free without medication for two years ... The military will not consider applications from epileptics until they have been seizure-free without medication for five years. Many states render epileptics ineligible for driver's licenses unless they have been seizure-free for a specified period of time ... Unable to drive to work, many epileptics have severely limited job opportunities. The unemployment rate among fully employable epileptics is more that two times the national average. The underemployment rate for epileptics is perhaps still higher ... *Reynolds v. Brock,* 815 F.2d 571 (9th Cir.1987). Our decision in this matter is based solely upon error in the trial court's jury charge. "A trial judge may properly define all pertinent questions of law, but if he fails to clarify the issues and the application of the law to the facts, a fair trial is not present." *Smith v. Clark,* 411 Pa. 142, 147, 190 A.2d 441, 443 (1963). Based upon this trial court error, we have concluded that disputed and admittedly complex questions of fact were never properly framed for the trier of fact in the instant case. Significant among those issues is whether Murphy could have safely performed a different job at Cartex's Doylestown plant. We decline at this juncture to decide questions of fact which necessarily involve the resolution of conflicting evidence and witness credibility. This is not our role. As a result, we must remand for a new trial.

7. We reject the argument advanced by Murphy that Cartex waived any objection to the jury trial by failing to raise the issue prior to trial. *See Molthan v. Temple University of Com. System of Higher Education,* 778 F.2d 955 (3d Cir.1985) (Claimant bringing sex discrimination actions under both 42 U.S.C.A. § 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e, *et seq.,* had a right to demand a jury trial, even though there is no right to a jury trial in cases arising under Title VII, because both claims were based upon the same facts.)

wealth shall not be foreclosed. If within one (1) year after the filing of a complaint with the Commission, the Commission dismisses the complaint or has not entered into a conciliation agreement to which the complainant is a party, the Commission must so notify the complainant. On receipt of such notice the complainant shall be able to bring an action in the courts of common pleas of the Commonwealth based on the right to freedom from discrimination granted by the act. If the court finds the respondent has engaged in such discriminatory practice charged in the complaint, the court shall enjoin the respondent from engaging in such unlawful discriminatory practice and order affirmative action which may include, but is not limited to, reinstatement or hiring of employes, granting of back pay, or any other legal or equitable relief as the court deems appropriate ...

43 Pa.S.A. § 962(c). Neither this nor any other provision of the PHRA states whether the proceedings authorized in the courts of common pleas may be tried before a jury.

■ Article I, Section 6, of the Pennsylvania Constitution provides:

Trial by jury shall be as heretofore, and the right thereof remain inviolate.

It has long been recognized that the Pennsylvania Constitution "only preserves the right to trial by jury in those cases where it existed at the time the constitution was adopted." *W.J. Dillner Transfer Co. v. Pennsylvania Public Utility Commission,* 191 Pa.Super. 136, 149, 155 A.2d 429, 435, (1959). Jury trials are not available in proceedings created by statute unless the proceeding has a common law basis or unless the statute expressly or impliedly so provides. *See Appeal of Watson,* 377 Pa. 495, 105 A.2d 576 (1954), *cert. denied,* 348 U.S. 879, 75 S.Ct. 120, 99 L.Ed. 692 (1954); *W.J. Dillner Transfer Co., supra; Commonwealth v. Marco Electric Manufacturing Corporation,* 32 Pa.Commw. 360, 379 A.2d 342 (1977). The PHRA and the rights it confers were nonexistent at the time the Pennsylvania Constitution

was adopted. Therefore, no right to a jury trial existed which the Constitution could preserve.

Having concluded that Murphy had no constitutional right to have a jury hear his PHRA claim, we also find, as a matter of statutory interpretation, that the legislature did not intend to provide a right to demand a jury trial in PHRA actions brought in the courts of common pleas. When ascertaining legislative intent, courts must consider the entire statute and avoid according an individual provision an interpretation which does not take into account related sections of the same statute. 1 Pa.C.S.A. § 1921(a); *Causer v. Mandarino*, 338 Pa.Super. 564, 488 A.2d 36 (1985). Under § 962(c), the Pennsylvania Human Relations Commission ("Commission") is accorded exclusive jurisdiction in the first instance to hear and to determine claims of unlawful discriminatory practice under the PHRA. We believe that our legislature, in establishing the Commission with extensive general powers and duties [8], certainly intended that the Commission would be primarily responsible for hearing claims based upon alleged violations of the PHRA and for providing appropriate remedies. When the Commission determines that a violation of the PHRA has been proven, and awards relief as it determines to be appropriate, our supreme court has recognized:

> We have made clear in our decisions that the Commission, when fashioning an award, has broad discretion and its actions are entitled to deference by a reviewing court. The Commission's order will not be disturbed unless it can be shown that the order is a patent attempt to achieve ends other than can fairly be said to effectuate the policies of the Act.

*Com., Pennsylvania State Police v. Com., Pennsylvania Human Relations Commission*, 512 Pa. 534, 538, 517 A.2d 1253, 1254 (1986). When the Commission adjudicates a claim of unlawful discriminatory practice under the PHRA, there is, of course, no right to request a jury trial.

8. *See* 43 Pa.S.A. § 957.

Pursuant to § 962(c), the courts of common pleas have the jurisdiction to hear a claim brought pursuant to the PHRA only when the Commission fails to act upon a claim within a one year period or decides to dismiss a claim. There is nothing in the specific language of § 962(c) nor in the legislative history of § 962(c) to indicate any intent on the part of the legislature to provide for a materially different proceeding when PHRA claims are decided, not by the Commission, but by a court of common pleas. The involvement of a jury would constitute a material difference.[9] *See Elizabeth Township v. Municipal Authority of McKeesport*, 498 Pa. 476, 447 A.2d 245 (1982) (Proceedings in the court of common pleas, under the Municipal Authorities Act of 1945, wherein the court was granted jurisdiction to hear challenges to rates set by municipal authorities, are to be conducted in the same manner as rate proceedings brought before the Public Utility Commission, and therefore, a jury trial is not available.) Moreover, we note that, although legal relief may be awarded by the court, most of the relief which is specifically enumerated in the PHRA is equitable in nature: enjoining further unlawful discriminatory practice, ordering the reinstatement or hiring of individuals, ordering the upgrading of employees, awarding back pay. *See* 43 Pa.S. § 959(f) and § 962(c). It is a general precept of the law that courts are uniquely qualified to fairly grant equitable relief.

Ordinarily, the propriety of affording equitable relief in a particular case rests in the sound discretion of the court, to be exercised according to the circumstances and exigencies of the case ... Equity looks to the whole situation and grants or withholds relief as good conscience dictates, and a court of equity is bound to look into all the

9. The proceeding before the Commission is "statutorily ... directed to be expeditious and informal, as are most administrative proceedings. There are none of the formal trappings, evidentiary protections, and strict procedures of a court of law. In addition, the members of the Commission necessarily need not be trained or learned in the law." *Pennsylvania Human Relations Commission v. Zamantakis*, 478 Pa. 454, 458, 387 A.2d 70, 72 (1978) (citation omitted).

facts and circumstances and determine what is fair, just, and equitable.

27 Am Jur 2d Equity § 102.

Finally, we are also cognizant of the fact that the PHRA was modeled after Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e *et seq.* In 1972, the U.S. Congress amended Title VII to expressly provide for bench trials in all Title VII cases brought in federal district courts. *See* 42 U.S.C.S. § 2000e–5(f)(4). However, prior to this amendment, federal courts had consistently held that there is no right to a jury trial in a Title VII case. *See Cox v. Babcock & Wilcox Co.*, 471 F.2d 13 (4th Cir.1972). We presume that our legislature was aware of the judicial interpretations and statutory amendments under Title VII when it eliminated the Commission as the only remedy for discrimination when the provisions of the PHRA are invoked, and provided, under certain limited circumstances, access to the courts of common pleas.

For all of the foregoing reasons, we are convinced that the legislature did not intend to create a right to demand a jury trial when it enacted § 962(c) of the PHRA.

Reversed and remanded for further proceedings consistent with this Opinion. Jurisdiction is relinquished.

WIEAND, J., files a dissenting opinion.

WIEAND, Judge, dissenting:

The majority has determined to reverse and remand for a new trial. I dissent. In my judgment, the evidence was insufficient to show a violation of the Pennsylvania Human Relations Act of October 27, 1955, P.L. 744, as amended, 43 P.S. § 951 et seq. Therefore, I would direct that the verdict be vacated and that judgment n.o.v. be entered in favor of the appellant-employer.

The Pennsylvania Human Relations Act forbids denial of employment on the basis of a "non-job related handicap or disability." This is defined as:

[A]ny handicap or disability which does not substantially interfere with the ability to perform the essential functions of the employment which a handicapped person applies for, is engaged in or has been engaged in.

Pennsylvania Human Relations Act, *supra*, § 4, as amended, 43 P.S. § 954(p). A "non-job-related handicap or disability" is further explained by regulation, 16 Pa.Code § 44.4, as follows:

(ii) A handicap or disability is not job-related merely because the job may pose a threat of harm to the employe or applicant with the handicap or disability unless the threat is one of demonstrable and serious harm.

(iii) A handicap or disability may be job-related if placing the handicapped or disabled employe or applicant in the job would pose a demonstrable threat of harm to the health and safety of others.

The record in the instant case demonstrates unequivocally that Boyd Murphy's epilepsy was uncontrolled and that his continued employment posed a serious threat of injury to himself and others. His disability, therefore, was clearly job-related.

Shortly after Murphy had started working for Cartex Corporation, his supervisor became aware that Murphy was afflicted with epilepsy, for Murphy had a seizure on the job. Murphy was thereupon examined by his physician at the company's request. Based upon the contents of a letter from the physician, Murphy was offered a position in another department pursuant to a special "bumping privilege" in the company's policy. The offered position would have allowed Murphy to take the longer work breaks which his physician had recommended. Murphy rejected his employer's offer because it involved a cut in wages. He assured his supervisor that he would take his medication as prescribed and that his seizures would not recur. Murphy worked on the production line for Cartex for a period of two and one-half years, during which he suffered approximately

fifteen seizures while at work. The evidence also showed that Murphy had suffered several seizures outside the workplace, one of which had occurred while he was driving and had resulted in an automobile accident.

Throughout the period of his employment, Murphy assured his supervisor that the seizures could be controlled by medication and that he would take his medication regularly. His immediate supervisor testified that Murphy attributed his seizures to lack of sleep, poor diet, failure to take his medication, and stress. The testimony was that during seizures, Murphy had to be carried off the production line and that he then had to rest for varying periods of time. These interruptions interfered with the performance of his job and also with the abilities of those around him to perform their work. Murphy continued to work at Cartex until, finally, a seizure occurred which resulted in serious burns to Murphy's hands. Murphy's supervisor testified that Murphy's continued employment would have posed a threat to the safety of himself and others.

The statute does not prevent an employer from discharging an employee who suffers from a handicap or disability which is job-related. There is no duty to employ a person who, because of handicap or disability, presents a safety risk to himself and other employees. *Jenks v. Avco Corp.*, 340 Pa.Super. 542, 551, 490 A.2d 912, 917 (1985).

The Act has been interpreted to impose upon an employer a duty to make reasonable accommodations in order to utilize the productive capacities of a handicapped person to the fullest extent. *Jenks v. Avco Corp., supra,* 340 Pa.Superior Ct. at 550, 490 A.2d at 916. While conceding that his epilepsy was a condition which impaired his ability to work on the production line, Murphy argues that the company's "bumping" policy required that it accommodate his epilepsy by offering him another job. Assuming, without deciding, that an employer's duty to make reasonable accommodations extends not only to the job which an employee was

hired to perform but to other available positions as well, the evidence in this case failed to show that there were any jobs available for which Murphy's uncontrolled epilepsy would not have been an impediment.[1]

Cartex's bumping policy permitted an employee with a medical problem which interfered with the performance of his job to move to a different job and "bump" an employee with less seniority so long as the medical condition did not impede the employee's ability to perform the duties of the new job. Murphy contended that he should have been permitted to take a position in the finishing department, the warehouse department, or in the maintenance department as a janitor. The evidence showed, however, that Murphy had been considered for these jobs prior to the decision to terminate him. The decision to terminate had been made only after Cartex had determined that there were no jobs available that Murphy could perform without danger to himself and others. In the finishing department work was done with electrically powered tools[2] which, of necessity, posed a risk to an employee with uncontrolled epilepsy. Work in the warehouse included the loading and unloading of trucks on a four foot high loading dock, the handling of drums weighing five hundred pounds, the lifting and stacking on shelves of various materials weighing between thirty and one hundred pounds, and the driving of a fork-lift truck. The janitorial duties required an employee to climb ladders[3] and occasionally drive a vehicle. Duties in the warehouse and maintenance departments, moreover, were largely unsupervised so that employees were required frequently to work alone. Although appellant claimed the right to "bump" into these positions, he failed to present any medical evidence, in response to his employer's testimo-

1. The evidence showed that Cartex employed other epileptics, but that in such cases the affliction was controlled and did not present a danger to the employee or others.

2. These tools included saws, sanders, buffers, and trimmers.

3. Ladders were involved in painting, washing windows, and changing light bulbs.

ny to the contrary, that his epilepsy was controllable and that he was physically able to fulfill the duties and responsibilities of other available positions without endangering himself or others.

Murphy argues that work conditions in the production room, which included heat, stress, overtime hours, and limited work breaks, contributed to his seizures. This contention, also, is not supported by medical evidence. Moreover, the evidence showed that Murphy had not complained or made known to his employer that he believed that his seizures were being brought on by the conditions under which he worked. Instead, he had continued to assert that he could control his seizures by medicine and rest. At the time of his discharge, however, his seizures were uncontrolled. He was terminated not because he was an epileptic but because he was unable to control his seizures in the workplace. There is no basis in the record to conclude that his seizures would be better controlled if he were assigned to another department.

Because appellee failed to show that other jobs were available which would eliminate the risk of harm to himself and others by virtue of uncontrolled epileptic seizures, I would hold that the Human Relations Act imposed upon his employer no duty to continue his employment. Appellee's disability, because it constituted a substantial risk to the safety of himself and others, was clearly job-related. Therefore, Cartex could terminate Murphy's employment. It was not required to continue his employment until serious harm occurred. Neither was it required to create for him a special job at which he could work without threat of harm from uncontrolled seizures.

I would reverse and enter judgment in favor of the appellant-employer.