The VERTIS GROUP, INC., Crain/Hallas Corporation, and Lawrence Crain, Joyce Hallas Crain, Mark Crain and Brian Crain, individuals and successors-in-interest to Crain/Hallas Corporation, Petitioners,

v.

PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued Oct. 9, 2003.
Decided Dec. 5, 2003.
Reargument En Banc Denied
Jan. 30, 2004.

Dennis J. Lewis, Pittsburgh, for petitioner.

Kimberly A. Joyce, Harrisburg, for respondent.

Richard B. Tucker, III, Pittsburgh, for intervenor, Duquesne Light Company.

BEFORE: SMITH–RIBNER, Judge, and FRIEDMAN, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Senior Judge McCLOSKEY.

The Vertis Group, Inc., Crain/Hallas Corporation, Lawrence Crain, Joyce Hallas Crain, Mark Crain and Brian Crain, individuals and successors-in-interest to Crain/Hallas Corporation (hereafter collectively referred to as the Vertis Group)[1] petition for review of an order of the Pennsylvania Public Utility Commission (the PUC), granting in part and denying in part the exceptions filed by the Vertis Group in response to a decision from an administrative law judge (ALJ). Further, the PUC order followed the recommendation of the ALJ and dismissed a complaint filed by the Vertis Group against Duquesne Light Company (Duquesne Light).

The Vertis Group operated a business at 846 Fourth Avenue, Coraopolis, Pennsylvania, from 1994 to 1997. This business performed two types of service. The first was a scheduling service providing qualified physicians to conduct independent medical examinations with respect to claims for workers' compensation benefits and claims under other insurance policies. The second was medical bill re-pricing services with explanation of benefits statements to ensure compliance with workers' compensation and other pricing guidelines. In providing these services, the Vertis Group was heavily dependent on computer equipment and a specially-designed scheduling software program.[2] The Vertis

---

1. Although not entirely clear in the record, it appears that the Crain/Hallas Corporation and the Vertis Group, Inc. were owned by the same individuals, Joyce Hallas Crain, Larry Crain, Brian Crain and Mark Crain. Both conducted the same business, with the Crain/Hallas Corporation operating solely in Florida until its formal dissolution in October of 1996.

2. This scheduling program was created by several outside consultants and in-house programmers and did utilize in part a commercially-available software program known as "MED–DATA."

Group utilized this equipment and software in conjunction with data-entry clerks. Duquesne Light provided the Vertis Group with commercial electric service at its facility in Coraopolis.

The Vertis Group immediately began experiencing hardware and software problems such as data scrambling, hardware malfunctions and "blow-outs" at its facility. The Vertis Group alleged that it also experienced power surges, power drops and harmonic distortions at its facility, which in turn caused physical damage to computer equipment, deletion of data and, ultimately, a loss of customers. The Vertis Group notified Duquesne Light of its problems and a technician was dispatched to the location on May 16, 1995, to check the connections on the nearest transformer and to measure the incoming voltage. The voltage measured within the range required by PUC regulations and Duquesne Light's tariffs. On the same day, the technician installed a circular voltage chart at the facility to monitor incoming voltage. The chart remained at the facility until May 24, 1995. Upon reviewing the chart, however, the recorded voltage again measured within the range required by the aforementioned regulations and tariff.

Nevertheless, on May 18, 1995, the Vertis Group again complained to Duquesne Light and another technician was sent to the facility. This technician also found the voltage to be within the required range. Despite this finding, Duquesne Light arranged to replace all of the connections at the transformer servicing the facility and offered to test the voltage with a BMI Power Quality Analyzer (BMI)[3] if the problems persisted. These connections

were indeed changed the next day, May 19, 1995. On June 5, 1995, the Vertis Group informed Duquesne Light that it had again experienced voltage problems and equipment damage. On June 8, 1995, the parties met to discuss the problems and a Duquesne Light engineer, Timothy Bray (Bray), installed a BMI device at the facility. Numerous investigations were conducted at the facility through August 2, 1995, and numerous conversations were held between representatives of the Vertis Group and Duquesne Light, including Bray and Clifford Blashford (Blashford), another Duquesne Light engineer and account representative.

During the course of the investigation, the BMI device recorded and later measured a number of transient voltage spikes at the facility.[4] On June 13, 1995, Blashford and Bray met with representatives of the Vertis Group, who had shut off the air conditioning and electric hot water tanks for study purposes. During the time that these systems were shut down, the BMI only recorded one disturbance overnight. Blashford and Bray informed the Vertis Group that even common office equipment, such as a refrigerator or water cooler, could cause the transients. Further, due to the fact that these transients contained extremely small amounts of energy and lasted only microseconds, Blashford and Bray indicated that the transients were insufficient to damage computer equipment. They recommended that the Vertis Group install three levels of surge suppression, including an uninterruptible power supply (UPS) to protect their equipment and computer system. The Vertis Group installed the levels of surge sup-

3. BMI refers to "Basic Measuring Instrument."

4. A transient is a sub-cycle voltage fluctuation of very short duration, typically lasting for only a few microseconds to less than a milli-

second and having energy of less than a single Joule. A "Joule" is a measurement of energy and consists of one watt of energy for one second of time.

pression but did not utilize UPS equipment.

Contrary to these indications, however, and in order to satisfy the concerns of the Vertis Group's customers, Blashford provided the Vertis Group with a letter dated June 13, 1995, noting that the facility was experiencing "300–500V voltage transients," which he described as "an abnormal condition" and which were "sufficient to damage sensitive data processing equipment such as computers, and network servers."[5] (R.R. at 1715a).

Duquesne Light thereafter investigated the entire circuit serving the facility but found no evidence of any problems. All of the tests revealed voltages within PUC regulations and evidenced no problems with the Duquesne Light distribution system. Additionally, Duquesne Light noted no other customer on the same circuit as the Vertis Group as having similar complaints of voltage problems. Nonetheless, the problems at the Vertis Group continued and eventually it ceased operations.

The Vertis Group then sold the building in Coraopolis to an engineering company, Lennon Smith Souleret Engineering (LSSE), during which sale the Vertis Group never disclosed to the buyer any electrical problems. Upon occupation of the building, LSSE experienced data corruption problems which it attributed to a computer network that was substandard and improperly wired and not to any electrical problems at the site.[6] LSSE thereafter fixed the networking problems and experienced no further data corruption problems.

The Vertis Group proceeded to initiate a civil action against Duquesne Light in the Court of Common Pleas of Allegheny County (trial court) with the filing of a complaint alleging breach of contract, breach of implied and express warranties and negligence. The complaint was filed in November of 1997. Duquesne Light filed an answer essentially denying the allegations of the complaint. The Vertis Group demanded a jury trial. The case was placed at issue by Duquesne Light in January of 1998 and was scheduled for trial in late January 1999.

However, on January 12, 1999, Duquesne Light filed a motion to bifurcate and transfer to the PUC for a determination of liability. In its motion, Duquesne Light indicated that the complex and technical claims relating to the reasonableness, adequacy and sufficiency of its electric service needed the expertise of the PUC. Duquesne Light further indicated that the PUC had exclusive jurisdiction over such issues as compliance with its tariff. The Vertis Group filed an answer asking the trial court to deny the motion and both parties briefed the issue.

In the meantime, on January 25, 1999, the Vertis Group filed an amended complaint adding a count of strict liability against Duquesne Light. That same day, the Vertis Group also filed a motion to postpone the trial, only a couple of days away, as a result of the amended complaint and inevitable preliminary objections. By order dated March 17, 1999, the trial court denied Duquesne Light's motion to bifurcate the liability issue and transfer it to the PUC. Thereafter, Duquesne Light filed an answer to the amended complaint.

5. Blashford wrote this letter on behalf of Duquesne Light with the understanding that the Vertis Group was going to forward the same to its customers to demonstrate that the problem had been identified and would be solved.

6. Specifically, LSSE discovered that data cables were placed directly next to main electrical wiring in the building, leading to electromagnetic interference and data corruption.

Due to a trial backlog, the case was continued until the September 1999 trial list and later to the January 2000 trial list. Nonetheless, prior to trial, Duquesne Light filed a motion with the trial court for reconsideration of its earlier denial of the bifurcation/transfer motion. Upon reconsideration, by order dated September 30, 1999, the trial court granted said motion, vacated its March 17, 1999, denial and transferred the case to the PUC for a determination of all liability issues.

In May of 2000, the Vertis Group proceeded to file its complaint with the PUC, incorporating its amended complaint previously filed with the trial court. However, the complaint filed with the PUC contained an additional allegation that Duquesne Light had violated Section 1501 of the Public Utility Code (the Code), 66 Pa. C.S. § 1501, by (1) failing to furnish and maintain adequate, efficient, safe and reasonable services and facilities; (2) failing to make all repairs, changes and improvements in or to such services and facilities as were necessary and proper for the accommodation, convenience and safety of its customers; (3) failing to provide service which was reasonably continuous and without unreasonable interruptions or delay; and (4) failing to provide service and facilities in conformity with the regulations and orders of the PUC. Duquesne Light filed a response to this complaint again essentially denying the allegations therein.

The matter was thereafter assigned to the ALJ for hearings. Numerous hearings were held in September and November of 2001 as well as January of 2002. At these hearings, both parties presented numerous witnesses and exhibits. Following the completion of the hearings and submission of briefs, the ALJ issued an initial decision and order recommending that the Vertis Group's complaint be denied. The ALJ concluded that: the Vertis Group's right to a trial by jury had not been abridged; the Vertis Group had failed to meet its burden of proving that Duquesne Light supplied inadequate, insufficient, unsafe or unreasonable electrical service; the Vertis Group had failed to meet its burden of proving that Duquesne Light conducted an investigation of its complaints in an inadequate, inefficient, unsafe or unreasonable manner; and the Vertis Group had failed to meet its burden of proving that Duquesne Light had failed to abide by its tariff requirements for supplying electrical energy to the premises.

The Vertis Group thereafter filed twenty-six legal and factual exceptions to the ALJ's initial decision alleging that the ALJ was mistaken in his application of the legal issues to this case and misapprehended or overlooked important and substantial facts presented in evidence. Duquesne Light filed a reply to the exceptions. The PUC ultimately issued an opinion and order dated February 24, 2003, essentially denying the Vertis Group's exceptions, adopting the ALJ's initial decision and dismissing the Vertis Group's complaint.[7] The PUC concluded, as did the ALJ, that the Vertis Group failed to show, by a preponderance of the evidence, that it experienced substantial damage to its computer equipment or that power quality issues originating with Duquesne Light's electrical service caused corrupted data or damage to said equipment.[8]

---

7. The PUC granted two of the Vertis Group's exceptions in part as they related to factual findings by the ALJ. Nevertheless, the issues addressed in these exceptions were minor and in no way affected the outcome of the case.

8. The PUC noted that testimony from subsequent purchasers of the Vertis Group's Coraopolis facility, which testimony indicated that it too experienced data corruption problems but that said problems were corrected within the facility by relocating computer

The PUC noted that the quality of the testimony submitted on behalf of the Vertis Group paled as compared to the expert and fact testimony submitted on behalf of Duquesne Light on the issues of power quality, computer hardware and electrical service. The Vertis Group then filed a petition for review with this Court. On April 14, 2003, Duquesne Light filed a notice of intervention with this Court.

As the Vertis Group's appeal was pending, the PUC filed a motion on September 30, 2003, to quash the Vertis Group's petition for review insofar as it seeks to appeal the trial court's bifurcation order. The PUC alleged, inter alia, that the trial court's bifurcation order was interlocutory and that review of that order should await referral back to the trial court and the issuance of its decision and order. After such issuance, the PUC alleged that the Superior Court would have jurisdiction to review the bifurcation order. The Vertis Group thereafter filed a reply to the PUC's motion alleging, inter alia, that this Court has jurisdiction to review the propriety of the trial court's bifurcation order.

■ We begin by addressing this motion. Although not specifically stating that the appellate courts have jurisdiction to review such orders, we note that our Supreme and Superior Courts as well as this Court have previously engaged in such review prior to the issuance of a lower court's decision and order. *See Elkin v. Bell Telephone Company*, 491 Pa. 123, 420 A.2d 371 (1980); *Poorbaugh v. Pennsylvania Public Utility Commission*, 666 A.2d 744 (Pa.Cmwlth.1995), *petitions for allowance of appeal denied*, 544 Pa. 678, 678 A.2d 367 (1996), 548 Pa. 662, 698 A.2d 69 (1995); *Optimum Image, Inc. v. Philadelphia Electric Company*, 410 Pa.Super. 475, 600 A.2d 553 (1991). Moreover, we believe it would be illogical and a waste of judicial resources for an appellate court such as this Court to consider the merits of a PUC decision and order,[9] but not consider the propriety of a trial court's order directing bifurcation in the first place.[10]

■ We next address the Vertis Group's argument on appeal that the trial court erred as a matter of law in bifurcating the case.[11] We disagree.

The issue of bifurcation encompasses a discussion of what has been referred to as the doctrine of primary jurisdiction, recognizing that both courts and administrative agencies must each play a role in the adjudication of certain matters.[12] Our Su-

---

data cables away from main electrical cables, "cast significant doubt on the credibility of [the Vertis Group's] witnesses as well as their allegations in this case." (PUC Decision, p. 74).

9. In *Elkin*, our Supreme Court indicated that the bifurcation procedure in no way affects a party's ability to appeal the PUC's final decision and order to the appropriate court, i.e., this Court, following issuance of the same.

10. Following the PUC's reasoning to its logical conclusion, this Court could address the merits of a final decision and order, only later for the Superior Court to conclude that bifurcation was not appropriate in the first instance. To the contrary, we believe that review of the bifurcation order is an inherent component of review of the entirety of the PUC's decision.

11. Our scope of review of the PUC's decision is limited to determining whether constitutional rights have been violated, whether an error of law has been committed, or whether findings and conclusions of law were supported by substantial evidence. *City of Chester v. Pennsylvania Public Utility Commission*, 798 A.2d 288 (Pa.Cmwlth.2002). We will apply this same scope of review to the trial court's bifurcation order.

12. The PUC has extensive statutory responsibility for ensuring the adequacy, efficiency, safety and reasonableness of public utility services. *See* 66 Pa.C.S. § 1501; *Elkin*. The

preme Court discussed this doctrine in detail in *Elkin,* stating as follows:

> To accommodate the role of the court with that of the agency, the doctrine of primary jurisdiction (or primary exclusive jurisdiction) has been developed. Essentially, the doctrine creates a workable relationship between the courts and administrative agencies wherein, in appropriate circumstances, the courts can have the benefit of the agency's views on issues within the agency's competence.

> . . .

> The doctrine serves several purposes, chief of which are the benefits to be derived by making use of the agency's special experience and expertise in complex areas with which judges and juries have little familiarity. Another important consideration is the statutory purpose in the creation of the agency-the powers granted by the legislature and the powers withheld. And, another fundamental concern is the need to promote consistency and uniformity in certain areas of administrative policy. It has been noted that these purposes are frequently served in, and the doctrine of primary jurisdiction principally applicable to, the controversies concerning the so-called "regulated industries."

> It is equally important to realize what the doctrine is not-it is not simply a polite gesture of deference to the agency seeking an advisory opinion wherein the court is free to ignore the agency's determination. Rather, once the court properly refers a matter or a specific issue to the agency, that agency's deter-mination is binding upon the court and the parties (subject, of course, to appellate review through normal channels), [13] and is not subject to collateral attack in the pending court proceeding.

> . . .

> Once the administrative tribunal has determined the issues within its jurisdiction, then the temporarily suspended civil litigation may continue, guided in scope and direction by the nature and outcome of the agency determination.

*Elkin,* 491 Pa. at 131–134, 420 A.2d at 376–377 (citations omitted) (footnotes omitted).

Further, the Court in *Elkin* enunciated the following test to be applied to determine whether bifurcation is appropriate:

> [W]here the subject matter is within an agency's jurisdiction and where it is a complex matter requiring special competence, with which the judge or jury would not or could not be familiar, the proper procedure is for the court to refer the matter to the appropriate agency. Also weighing in the consideration should be the need for uniformity and consistency in agency policy and the legislative intent. Where, on the other hand, the matter is not one peculiarly within the agency's area of expertise, but is one which the courts or jury are equally well-suited to determine, the court must not abdicate its responsibility. In such cases, it would be wasteful to employ the bifurcated procedure of referral, as no appreciable benefits would be forthcoming.

courts of common pleas have traditionally retained original jurisdiction to entertain suits for damages against public utilities. *See Elkin; Feingold v. Bell of Pennsylvania,* 477 Pa. 1, 383 A.2d 791 (1977).

**13.** As noted above, we indicated in *Elkin* that bifurcation does not affect a party's right to seek appellate review of the PUC determination. In other words, we indicated in *Elkin* that review of the PUC decision should proceed through normal channels of review.

*Elkin,* 491 Pa. at 134–135, 420 A.2d at 377 (footnote omitted).

█ In applying this test, we must look at the complaint, or amended complaint as in this case, to determine if bifurcation was appropriate. In its amended complaint filed with the trial court, the Vertis Group alleged that as its computer equipment was "quite sophisticated and sensitive to voltage fluctuations and other power interruptions such as voltage spikes ... it was essential that electric power of a consistent voltage (within the legal voltage range, i.e. 120/20 V +/–5%), and harmonic level be delivered at all times." (Amended Complaint, Paragraph 13, R.R. at 295a).

Additionally, the Vertis Group alleged that Duquesne Light "agreed to supply electric power ... within the legal voltage range, i.e., 120/208V +/–5%, and at acceptable harmonic levels, in accord with its published tariffs." (Amended Complaint, Paragraph 27, R.R. at 299a). Instead of supplying such power, the Vertis Group indicated that the power it received "was not of merchantable quality in that, *inter alia,* it did not pass objection within the trade under the contract description, was not of fair average equality, was not fit for the ordinary purposes for which such power is used, did not run within variations

permitted by the Agreement, and was not otherwise acceptable."[14] (Amended Complaint, Paragraph 33, R.R. at 300a).

Further, the Vertis Group alleged that Duquesne Light "through its published tariffs, advertising and other promotional and/or sales activities, represented, promised and warranted to Plaintiffs that it would delivery [sic] a safe and reliable source of electric power to Vertis' Coraopolis location...." (Amended Complaint, Paragraph 38, R.R. at 301a). Moreover, the Vertis Group alleged that Duquesne Light "refused or was unable to prevent or correct such problems." (Amended Complaint, Paragraph 45, R.R. at 302a).

As the allegations of the Vertis Group's amended complaint appear to address subject matter of a complex nature, as well as such issues as Duquesne Light's published tariffs, legal voltage range and the reasonableness, safety and quality of the electrical power provided by Duquesne Light, i.e., issues within the exclusive province of the PUC, we cannot say that the trial court erred as a matter of law in bifurcating the case.[15]

Next, the Vertis Group argues that the PUC erred as a matter of law by precluding it of its right to a trial by jury with

**14.** More specifically, the Vertis Group alleged that the electric power supplied by Duquesne Light "was plagued by power spikes, some in excess of 800 bolts [sic], power drops, harmonic distortion in excess of 3,000 percent as well as other irregularities and inconsistencies...." (Amended Complaint, Paragraph 33, R.R. at 300a). The Vertis Group characterized the power provided as "not safe and ... not delivered within the legal voltage range or within acceptable harmonic levels ... [and] was not fit for the particular purposes for which the power was required." (Amended Complaint, Paragraph 35, R.R. at 300a–301a).

**15.** We note that our Superior Court's decision in *Optimum Image, Inc.* was instructive on

this issue, as the facts of that case are quite similar to the facts of the present case before this Court. Under this similar factual pattern, the Superior Court in *Optimum Image, Inc.* also held that bifurcation was appropriate. Moreover, in *Poorbaugh,* we distinguished the facts of that case from the facts of *Optimum Image, Inc.,* noting that the former involved one specific instance of electrical problems whereas the latter, similar to the facts of the present case, involved electrical problems over an extended period of time. Further, unlike *Optimum Image, Inc.,* we noted that the petitioner in *Poorbaugh* had "not raised any issues relating to tariffs which would certainly require the expertise of the PUC." *Poorbaugh,* 666 A.2d at 751.

respect to its common law claims. Again, we disagree.

Article 1, Section 6 of the Pennsylvania Constitution provides, in pertinent part, that "[t]rial by jury shall be as heretofore, and the right thereof remain inviolate." In addition, Section 901 of the Code addresses a party's right to a trial by jury, providing, in pertinent part, as follows:

> Nothing in this part shall be construed to deprive any party, upon any judicial review of the proceedings and orders of the commission, of the right to trial by jury of any issue of fact raised thereby or therein, where such right is secured either by the Constitution of Pennsylvania or the Constitution of the United States, but in every such case such right of trial by jury shall remain inviolate.

66 Pa.C.S. § 901.

■ Our Supreme Court has interpreted Article 1, Section 6 of the Pennsylvania Constitution as only preserving the right to trial by jury in those cases where it existed at the time the Constitution was adopted in 1790. *See Commonwealth v. One (1) 1984 Z-28 Camaro Coupe,* 530 Pa. 523, 610 A.2d 36 (1992); *see also W.J. Dillner Transfer Company v. Pennsylvania Public Utility Commission,* 191 Pa.Super. 136, 155 A.2d 429 (1959).[16] Jury trials are not available in proceedings created by statute unless the proceeding has a common law basis or unless the statute expressly or impliedly so provides. *One (1) 1984 Z-28 Camaro Coupe.*

From these interpretations, a three-part test has evolved to determine whether a party is entitled to a jury trial. *Id.; Wertz v. Chapman Township,* 559 Pa. 630, 741 A.2d 1272 (1999). First, the court looks to see if there is a statutory requirement for a jury trial in the case. Second, the court inquires as to whether, with respect to the proceedings before the court at the time, jury trials were required in 1790. Finally, if jury trials were required, the court inquires as to whether there was a common law basis for the proceeding.[17]

■ In this case, there is no dispute that the statute at issue, i.e., the Code, does not expressly or impliedly require a trial by jury. With respect to the second prong of the test enunciated above, we note, as did the ALJ, that regulated public utility service did not exist at the time of the adoption of the Pennsylvania Constitution in 1790. Since regulated public utility service did not exist in 1790, the Vertis Group was unable to point to any similar proceedings in 1790 to which a right to a jury trial would apply.[18] As no jury trial was required, we need not reach the third prong of the test, i.e., whether there was a common law basis for the proceeding.

■ Next, the Vertis Group argues that the PUC erred as a matter of law and exceeded its statutory jurisdiction and jurisdictional authority by purporting to adjudicate all of its common law claims. Once more, we disagree.

16. In *W.J. Dillner Transfer Company,* our Superior Court held that an individual had no constitutional right to jury trial with respect to violation of the then-called Public Utility Law because at the time the Pennsylvania Constitution was adopted, the PUC was non-existent and no common law right to a jury trial existed for a motor carrier charged with a violation of his certificate.

17. The term "common law basis" does not mean that an action originated at common law. Instead, this term refers to the nature of the proceeding in common law courts. *One (1) 1984 Z-28 Camaro Coupe.*

18. As noted above, the Vertis Group's amended complaint focuses upon the alleged failure of Duquesne Light to provide power which was reasonable, adequate, safe and in accordance with its published tariffs.

■ The PUC is a creature of statute. As such, "it has only those powers which are expressly conferred upon it by the Legislature and those powers which arise by necessary implication." *Feingold,* 477 Pa. at 8, 383 A.2d at 794. The Code has placed a broad range of subject matter under the control of the PUC. For example, Section 1501 of the Code renders the PUC responsible for ensuring the adequacy, efficiency, safety and reasonableness of public utility services, facilities and/or rates.

Additionally, Section 1504 of the Code enables the PUC to prescribe "just and reasonable standards, classifications, regulations and practices to be furnished, imposed, observed and followed by any or all public utilities." 66 Pa.C.S. § 1504(1). Under this Section, the PUC may prescribe "adequate and reasonable standards for the measurement of quantity, quality, pressure, initial voltage or other condition pertaining to the supply of the service of any and all public utilities." *See* 66 Pa. C.S. § 1504(2). The PUC may also prescribe reasonable rules, regulations, specifications and standards relating to "the examination and testing of . . . service" as well as "the accuracy of all meters and appliances for measurement." *See* 66 Pa. C.S. § 1504(3), (4).

Nevertheless, as noted above, despite the PUC's extensive statutory responsibilities, the courts of common pleas have traditionally retained original jurisdiction to entertain suits for damages against public utilities. *See Elkin; Feingold.* The courts of common pleas have also retained jurisdiction over common law claims. This issue is addressed in Section 103(c) of the Code, which provides that "nothing in this part shall abridge or alter the existing rights of action or remedies in equity or under common or statutory law of this Commonwealth, and the provisions of this part shall be cumulative and in addition to such rights of action and remedies." 66 Pa.C.S. § 103(c).

We have reviewed the thorough and lengthy decisions of both the ALJ and the PUC. Contrary to the Vertis Group's argument, our review of these decisions fails to reveal any instance whereby the ALJ or the PUC purported to rule upon its common law claims. At the very most, the ALJ and the PUC indicated that the fundamental premise underlying each count of the Vertis Group's amended complaint was the allegation that Duquesne Light failed to provide power that was adequate, efficient, safe, reasonable and in accord with its published tariffs.

Both the ALJ and the PUC consistently indicated that it was only addressing this allegation, an allegation within its exclusive jurisdiction. In fact, the PUC notes that its opinion, as well as the initial decision of the ALJ, only addressed those matters expressly reserved to the PUC in the Code. Furthermore, on at least two separate occasions, the PUC indicated that the application of its findings and determinations is a matter within the purview of the trial court. Thus, we cannot say that the PUC erred as a matter of law and exceeded its statutory jurisdiction and jurisdictional authority.[19]

Accordingly, the order of the PUC is affirmed.

---

**19.** The Vertis Group raises additional alternative arguments in its brief to this Court regarding the ALJ's and PUC's alleged failure to address the specific elements of its common law claims. However, as we indicated above that such claims are outside the purview of the PUC and we determined that the PUC did not, in fact, address those claims, we need not address these alternative arguments.

### *ORDER*

AND NOW, this 5th day of December, 2003, the order of the Pennsylvania Public Utility Commission is hereby affirmed.

## DISSENTING OPINION BY Judge FRIEDMAN.

I respectfully dissent. I do not agree that the Court of Common Pleas of Allegheny County (trial court) properly bifurcated the civil action brought against Duquesne Light Company (Duquesne Light) by The Vertis Group, Inc., Crain/Hallas Corporation, and Lawrence Crain, Joyce Hallas Crain, Mark Crain and Brian Crain, individuals and successors-in-interest to Crain/Hallas Corporation (collectively, Vertis Group). In addition, unlike the majority, I would hold that the Public Utility Commission (PUC) exceeded its jurisdiction by deciding common law liability issues set forth in the Vertis Group's complaint.

## I. Bifurcation of *All* Liability Issues

The Vertis Group filed a five-count civil complaint against Duquesne Light, alleging: (1) breach of contract; (2) breach of implied warranties; (3) breach of express warranties; (4) negligence; and (5) strict liability. (R.R. at 299a–303a.) The Vertis Group alleged that its computer network, and its business, was harmed by Duquesne Light's failure to supply electrical power within the legal voltage range and at acceptable harmonic levels and by Duquesne

Light's failure to correct the situation when notified of the problems. (*See* Complaint, ¶¶ 28, 33, 38, 44, 52.) The trial court bifurcated the case and transferred the matter to the PUC "for a determination of *all* liability issues." (R.R. at 353a, emphasis added.)

Under the doctrine of primary jurisdiction, (1) where the subject matter of a case is within an agency's jurisdiction and (2) where the case is a complex matter requiring special competence, with which the judge or jury would not or could not be familiar, the proper procedure is for the court to refer the matter, or a specific issue, to the appropriate agency.[1] *Elkin v. Bell Telephone Company*, 491 Pa. 123, 420 A.2d 371 (1980). For the reasons that follow, I conclude that the trial court erred in applying the doctrine of primary jurisdiction here.

### A. Subject Matter Jurisdiction

First, the trial court erred in applying the doctrine of primary jurisdiction in this case because the PUC does not have subject matter jurisdiction over a public utility's liability in common law actions.

The PUC is a creature of statute and, as such, has only those powers which are expressly conferred upon it by the legislature and those powers which arise by necessary implication. *Feingold v. Bell of Pennsylvania*, 477 Pa. 1, 383 A.2d 791 (1977). Under section 701 of the Public

---

1. Once a court properly refers a matter or a specific issue to an administrative agency, the agency's determination is binding upon the court and the parties. *Elkin v. Bell Telephone Company*, 491 Pa. 123, 420 A.2d 371 (1980). However, courts

> should not be too hasty in referring a matter to an agency, or to develop a "dependence" on the agencies whenever a controversy remotely involves some issue falling arguably within the domain of the agency's "expertise." "Expertise" is no talisman

dissolving a court's jurisdiction. *Accommodation* of the judicial and administrative functions *does not mean abdication* of judicial responsibility. The figure of the so-called "expert" looms ominously over our society—too much so to permit the roles of the court and jury to be readily relinquished absent a true fostering of the purposes of the doctrine of primary jurisdiction.

*Elkin*, 491 Pa. at 134, 420 A.2d at 377 (emphasis in original).

Utility Code (Code), when a person files a complaint with the PUC against a public utility, the PUC may determine *only* whether the public utility is in violation "of any law which the [PUC] has jurisdiction to administer, or of any regulation or order of the [PUC]." Section 701 of Code, 66 Pa.C.S. § 701. A common law action filed against a public utility is "in addition to" any action the PUC might take against the public utility under the Code. Section 103(c) of the Code, 66 Pa.C.S. § 103(c).

Here, *after* the trial court transferred the Vertis Group's complaint to the PUC, the Vertis Group filed an amended complaint with the PUC alleging that Duquesne Light violated section 1501 of the Code, 66 Pa.C.S. § 1501. Section 1501 requires that public utilities furnish adequate, efficient, safe and reasonable service and that public utilities make such changes in their service as shall be necessary for the accommodation of its patrons.[2] That would have been an appropriate issue for consideration by the PUC, but that issue was *not* part of the original complaint pending before the trial court. To the extent that the Vertis Group's trial court complaint *implies* a violation of section 1501 of the Code, the trial court should have transferred the case to the PUC solely to address that specific issue.[3]

### B. Complexity

Second, the trial court erred in applying the doctrine of primary jurisdiction be-

cause the case before the trial court was not a complex matter requiring special competence.

The issues facing the trial court were whether Duquesne Light failed to provide the Vertis Group with electricity within the required voltage range and harmonic levels and whether this failure damaged the computer network which the Vertis Group used to conduct its business. I submit that these issues are no more complex than many others which come before the courts, and, with the assistance of expert testimony, there was no reason why a jury could not have become familiar with legal voltage ranges, acceptable harmonic levels and the effect of abnormal voltage fluctuations on computer networks. *Cf. Schriner v. Pennsylvania Power and Light Company,* 348 Pa.Super. 177, 501 A.2d 1128 (1985) (stating that there is no reason why a jury could not become familiar with the problem of stray voltage injuries to dairy cattle).

In fact, given the substance of a June 13, 1995, letter from Duquesne Light to the Vertis Group, this case is quite simple. In the letter, Duquesne Light stated:

This letter documents the *abnormal* electrical conditions occurring at Vertis Group, Inc. in Coraopolis Borough.

This customer is experiencing 300–500V voltage transients over the nominal 120V circuit. *This overvoltage is an abnormal condition and sufficient to damage*

---

2. Section 1501 of the Code provides, in pertinent part, as follows:

Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public.

3. The majority concludes that the trial court did not err in applying the doctrine of primary jurisdiction in this case because the Vertis Group's allegations involve issues within the "exclusive province" of the PUC. (Majority op. at 13.) It is true that Duquesne Light's compliance with section 1501 of the Code is within the exclusive jurisdiction of the PUC; however, the trial court referred *all* liability issues to the PUC.

*sensitive data processing equipment such as computers, and network servers.*

(R.R. at 1715a) (emphasis added). Thus, Duquesne Light admitted that the Vertis Group was experiencing 300–500V voltage transients and that this overvoltage is an abnormal electrical condition sufficient to damage computer networks. Essentially, the June 13, 1995, letter is an admission of liability by Duquesne Light. Indeed, Duquesne Light's own expert testified that he would not have written such a letter to a customer, and he was "amazed" that Duquesne Light did so.[4] (R.R. at 1351a.)

Because the PUC lacked jurisdiction over *all* liability issues presented in the common law actions and because the common law actions were not so complex as to require special competence, I would reverse the trial court's bifurcation order.[5]

## II. Exceeding Jurisdiction

The majority concludes that the PUC did not exceed its jurisdictional authority because a review of the PUC's decision shows that the PUC decided only those matters expressly reserved for the PUC in the Code, i.e., whether Duquesne Light failed to provide power that was adequate, efficient, safe, reasonable and in accord with its published tariffs. (Majority op. at 17.) I disagree with this assessment of the PUC's decision.

## A. Breach of Contract

The PUC specifically addressed the Vertis Group's breach of contract claim as follows:

> While the Complainants go to great lengths to state their various claims in terms of contract and tort, the fact is that they have alleged no relationship with [Duquesne Light] other than that of customer and utility. That is the thrust of the ALJ's comments at page 33 of the Initial Decision regarding *the failure of Complainants to plead a specific or special contractual relationship.*

(PUC's op. at 15) (emphasis added) (*see also* R.R. at 756a). In other words, the PUC held that the Vertis Group's breach of contract claim must fail because the Vertis Group did not plead a specific contractual relationship with Duquesne Light. That is not true.

In Paragraph 15 of the complaint, the Vertis Group alleged that it entered into a contract with Duquesne Light in August of 1994 for electric service to the facility at 846 Fourth Avenue, Coraopolis, Pennsylvania. (R.R. at 295a.) Moreover, in Duquesne Light's answer to Paragraph 15, Duquesne Light *admitted* that it "contracted to provide [the] Vertis [Group] with electric service." (R.R. at 312a.) Thus, contrary to the PUC's discussion of the breach of contract issue, the parties

---

**4.** The PUC determined that the letter was not an admission of liability, believing that Duquesne Light wrote the letter only because the Vertis Group requested it "to put off" customers who were complaining about poor service. (R.R. at 1498a.) The PUC did not utilize any special expertise in making this determination.

If the PUC is correct, then, in providing service to the Vertis Group, Duquesne Light issued false statements intended to deceive the customers of the Vertis Group. In other words, Duquesne Light committed *fraud. See Frowen v. Blank,* 493 Pa. 137, 425 A.2d 412

(1981) (stating that fraud consists of anything calculated to deceive). Unlike the PUC, I would not hold that the commission of fraud constitutes reasonable service under section 1501 of the Code.

**5.** Because I would reverse the trial court's bifurcation order, I would not address the remaining issues. However, because the majority affirms the bifurcation, I will assume for the sake of argument that the bifurcation was proper and address whether the PUC exceeded its jurisdiction.

never disputed the existence of a specific contractual relationship.

Unlike the majority, I conclude that the PUC considered the breach of contract issue without jurisdiction to do so. Moreover, I would hold that the PUC erred in concluding that the Vertis Group could not prevail because it failed to allege a specific contractual relationship with Duquesne Light.

## B. Strict Liability

The PUC specifically addressed the Vertis Group's strict liability claim as follows:

> [Vertis Group has] utterly failed to show that *causation of the alleged harm* lies at the feet of [Duquesne Light]. That, coupled with the fact that the voltage Duquesne Light delivered to Vertis' facility fell within the [PUC] standard, directly rebuts the *Complainants' theory that the electricity provided by [Duquesne Light] was unreasonably dangerous so as to require a warning.* Hence, we have no hesitation in finding that [Duquesne Light] had no duty to warn.[6]

(PUC's op. at 30) (emphasis added) (citation omitted). Thus, the PUC determined that Vertis Group's strict liability claim must fail because the Vertis Group failed to prove that the power supplied by Duquesne Light constituted an unreasonably dangerous product that caused harm or required a warning.

As indicated above, the PUC has authority only to determine whether a public utility has violated the Code, PUC regulations or a PUC order. Thus, I conclude that the PUC exceeded its authority by addressing the Vertis Group's strict liability claim.

## C. Negligence

Finally, the PUC addressed the Vertis Group's claim that Duquesne Light was negligent because, having admitted in the June 13, 1995, letter that the 300–500V voltage transients were abnormal and were capable of damaging the Vertis Group's computer network, Duquesne Light failed to offer a viable solution to correct the problem. The PUC stated:

> According to the Complainants, this letter is either an admission that [Duquesne Light] provided unsafe power which caused the harm complained of, or clear evidence that [Duquesne Light's] power quality investigation was so flawed as to constitute a negligent undertaking. . . .

> [T]he letter, while possibly misguided given its eventual use in this proceeding by the Complainants, exhibited an extraordinary effort by [Duquesne Light] to provide customer assistance to the Complainants in dealing with their own customers.

(PUC's op. at 34.) Thus, the PUC concluded that Vertis Group's negligence

---

**6.** Electricity is a product for purposes of strict liability. *Kaplan v. Cablevision of Pa., Inc.,* 448 Pa.Super. 306, 671 A.2d 716, *appeal denied,* 546 Pa. 645, 683 A.2d 883 (1996). In a strict products liability action, it must be shown that the product was sold in a defective condition, unreasonably dangerous to the consumer, and the defect was the proximate cause of the consumer's injury. *Walton v. Avco Corporation,* 530 Pa. 568, 610 A.2d 454 (1992). The failure to warn of latent dangers in the use of a product can render a properly designed product unreasonably dangerous and defective for purposes of strict product liability. *Jacobini v. V. & O. Press Company,* 527 Pa. 32, 588 A.2d 476 (1991).

claim must fail. However, to reiterate, the PUC has authority to address only whether Duquesne Light violated the Code, the regulations or a PUC order.

Accordingly, assuming *arguendo* that the bifurcation was proper, I would nevertheless reverse the PUC's order to the extent that it addresses Duquesne Light's common law liability.