UGI UTILITIES, INC.—GAS DIVISION, Petitioner

v.

PUBLIC UTILITY COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued June 9, 2005.

Decided July 7, 2005.

David B. MacGregor, Philadelphia, for petitioner.

Jaime M. McClintock, Harrisburg, for respondent.

Todd S. Stewart, Harrisburg, for intervenor, Shipley Energy Company.

BEFORE: PELLEGRINI, Judge, SIMPSON, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge PELLEGRINI.

UGI Utilities, Inc.—Gas Division (UGI) appeals from an order of the Pennsylvania Public Utility Commission (PUC) adopting that portion of the recommended decision of the Administrative Law Judge (ALJ) modifying the financial security requirement it imposed on Shipley Energy Company (Shipley).

UGI is a natural gas distribution company (NGDC).[1] Shipley is a natural gas supplier (NGS)[2] which purchases natural gas from UGI and then sells the gas to its

---

**1.** Paul Szykman (Szykman), Director of Rates and Gas Supply for UGI, testified that UGI acts both as a common carrier for gas owned by its customers and purchases and sells natural gas supplies for its customers. He explained as follows:

Since at least the early 1980's, larger customers on UGI's system have been able to procure their own natural gas supplies and have UGI transport those supplies through the UGI system to their service locations under various UGI transportation rate schedules. Generally, those customers contract with NGSs that handle the functions of purchasing gas and arranging for the transportation of the gas to the UGI system. With the passage and implementation of the Natural Gas Choice and Competition Act, the right to procure natural gas supply services from third parties was extended to all customers, and NGSs were required to obtain licenses from the Commission. Under Section 2207 of the Public Utility Code, 66 Pa. C.S. § 2207, however, NGDCs or, under

certain circumstances, other Commission approved supplier(s) of last resort, retained the obligation to provide:

(i) natural gas supply services to those customers who have not chosen an alternate gas supplier or who chose to be served by their supplier of last resort;

(ii) natural gas supply services to those customers who are refused supply service from a natural gas supplier; or

(iii) natural gas supply services to those customers whose natural gas supplier has failed to deliver its requirement.

Thus, UGI is obligated to procure natural gas supplies and arrange for the delivery of such supplies to customer service locations for these categories of customers for which it acts as the supplier of last resort.

(Reproduced Record at 28a.)

**2.** Matthew Sommer (Sommer), Business Manager for Shipley, testified that Shipley was a "marketer of heating oil, natural gas, HVAC service and installation, and indoor air

customers which is delivered through UGI's distribution lines. On July 2, 2003, Shipley filed with the PUC a petition for modification of financial security requirements imposed by UGI for security as an NGS serving on UGI's system. UGI required Shipley to maintain a level of security equal to $10.2 million to operate on its system. Shipley requested an order reducing its required level of financial security on the UGI system; prohibiting UGI from using potential penalties as a basis for any security requirement; and requiring UGI to modify its supplier tariff to the extent necessary to make it consistent with the PUC's regulations. UGI filed an answer denying that its tariff was inconsistent with the PUC's regulations or inappropriate for Shipley's circumstances.

The PUC assigned the matter to an ALJ and directed that three questions be addressed:

· Whether the financial security criteria in the UGI tariff were consistent with the PUC's regulations and whether they were applied in a non-discriminatory manner;

· Whether the amount of Shipley's security was reasonably related to the financial exposure which could be imposed on UGI by the default or bankruptcy of Shipley; and

· Whether the financial security criteria in the UGI tariff adequately incorporated the PUC's regulations at 52 Pa. Code § 62.111(c)(1)(i) regarding the

quality systems to residential, commercial, and industrial customers in Central Pennsylvania." (Reproduced Record at 50a.)

3. Section 8.5 of UGI's Rules and Regulations relating to Financial Security provides:

8.5 Bonding Level—Unless Company otherwise agrees, the minimum level of financial security, in whatever form, shall be no less than the following:

criteria for modification and/or adjustment of the amount of security.

At the hearing, Paul Szykman (Szykman), Director of Rates and Gas Supply for UGI, explained that financial security was determined based on the Daily Delivery Requirement (DDR) to each supplier that represented the anticipated demand of the supplier's aggregated pool of customers. "The security requirement for an enrolled larger Choice customer [referring to the Natural Gas **Choice** and Competition Act (Act), Act of June 22, 1999, P.L. 122, 66 Pa.C.S. §§ 2201–2212] is determined by applying the formula specified in Section 8.5 of UGI's Choice Supplier Tariff (attached as Appendix PJS–2 to my direct testimony)[3] using the DDR at a design temperature of minus 1.2 degrees F for the Choice supplier's peak Design Day Requirement." (Reproduced Record at 76a.) He explained that it was necessary to use the rate proposed by UGI because UGI had to rely on the interstate pipeline facilities to which it was connected for incremental supplies. In the event of a default by Shipley or any NGS, UGI would have to purchase supplies from third parties who maintained pipeline capacity in the eastern part of Pennsylvania, and it would be likely that the default would occur during the coldest conditions on a 33–day cycle, with a forecasted gas price of $113.40/Dth, which UGI would have to pay to try to lure supplies away from other destinations to meet the unexpected load or find that supplies were not even available. Szykman further stated that there

$40 * 10 Days * Daily Volume (in Dth) of Company Pipeline Capacity Release, Assigned or Transferred to Choice Supplier by UGI; plus

$120 * 10 Days * Design Day Requirement (in Dth) Provided Using Third Party Capacity for Choice Supplier's Aggregation Pool.

were no price caps placed on what a supplier could charge UGI for replacement supplies in the event of an NGS' default.

Szykman also explained that it was necessary that the financial security requirement include a provision for any consumers to impose a penalty that could be imposed on Shipley or UGI because when UGI relied upon NGS Choice suppliers to deliver gas to its system, it did not buy back-up supplies to meet system requirements in the event of a default. An inclusion of a penalty was also necessary to prevent an NGS Choice supplier from diverting and selling supplies needed to meet its supply obligations in UGI's system to other market areas, i.e., to engage in arbitrage,[4] which would have an impact on other customers on UGI's system and the reliability of the system. "These penalty amounts reflect the fact that prices in other markets can reach very high levels, and that a strong incentive must be in place to remove the financial temptation to divert supplies to other markets." (Reproduced Record at 83a.) Szykman admitted on cross-examination, however, that he knew of no NGS Choice supplier or natural gas supplier that had engaged in arbitrage or any NGS Choice supplier on UGI's system that had engaged in arbitrage with their gas supplier.

Matthew Sommer (Sommer), Business Manager for Shipley, testified that Shipley had been serving customers on the UGI system since March 2002, and was rated as having an extremely low risk of failure or default. However, UGI's security requirement had a significant negative effect on Shipley's ability to do business. "Without substantial relief from that unwarranted burden, there is a very strong likelihood that we will not be a continuing presence in the UGI market. If that happens, customers, who currently are able to enjoy savings over POLR service from UGI will be left with no alternative, and UGI will have succeeded in driving the last remaining NGS from its territory." (Reproduced Record at 55a.)

James Christ (Christ), President of Lumen Group, Inc., a consulting firm that focused on regulatory and market issues, testified that he had calculated the security requirements of UGI as they applied to Shipley and found them to be significantly higher than they needed to be to comply with PUC regulations. Christ explained that UGI's required level of security was $1,200 per customer based on the $120 * 10 days * Design Day Requirement in Section 8.5, even though he calculated the actual maximum exposure to be $62.37 for the entire 30–day month. He made this calculation using the peak month of January, assuming it would be 20% colder than normal, and that the default by NGS would occur on average in the middle of the billing period or a 15–day exposure. He also stated he examined historical gas prices for the duration of the Choice program, or February 2002 to the present, February 2003, and took an average. Christ also stated that actual facts proved that where an NGS Choice supplier, including Shipley, had not delivered the required amount of gas to the UGI system, it did not require UGI to purchase any gas on the spot market. Therefore, there was no truth that a shortfall of delivered supply demanded high security. Christ recommended that the security requirement be set at $31.18 per customer or one-half

---

**4.** "Arbitrage" refers to a situation where UGI, as a seller of last resort, has to replace its diverted supplies and would potentially have to engage in a bidding war to divert other supplies or even the same supplies back to its own system. "The process of diverting supplies to take advantage of differences in prices between locations is referred to as 'arbitrage.'" (Reproduced Record at 31a.)

of the reasonably calculated maximum exposure amount. Christ also opined that financial exposure should not include penalties because "the non-cost based penalties, which UGI intends to be a discouragement to NGS to not perform, are insulting and not in the spirit of Choice ... While the NGDC should be entitled to recovery of actual costs, it should not be entitled to a steep penalty, and should not be allowed to include them in determining how much security to provide." (Reproduced Record at 65a–66a.)

In response to the first issue, the ALJ found that the financial security criteria in UGI's tariff was not consistent with the PUC's regulations because the PUC's regulations were obviously intended to regulate, not to make the security requirement so stringent and to cover such dire circumstances that would likely not occur so that there was no need for a regulation. As to the second issue, the ALJ found that the amount of Shipley's required security was not reasonably related to the financial exposure in UGI's tariff requirement for Shipley because, instead of basing its calculation on a reasonable situation, UGI based its calculations on a worst case scenario: a 33–day long billing cycle, a temperature for the entire cycle that remained below 23 degrees, a default occurring at the very beginning of the cycle, and a peak gas price at $113/Dth. Finally, regarding the third issue posed, the ALJ found there was no mention as to whether UGI's tariff adequately incorporated the PUC's regulations at 52 Pa.Code § 62.111(c)(1)(i) regarding the criteria for modification and/or adjustment of the amount of security, so the tariff did not adequately incorporate the PUC's regulations. The ALJ then ordered that UGI submit a replacement tariff provision reasonably related to the financial exposure imposed on it by a potential default or bankruptcy by Shipley using an average

billing cycle and the average cost of gas in January of 2003 and 2004. The ALJ specified that prepayment of penalties were not to be included in the security requirement.

UGI filed exceptions from the ALJ's decision arguing that: 1) the ALJ erred when she failed to include potential penalties in financial security obligations because NGSs were free to engage in arbitrage and divert gas supply from customers on UGI's system to markets that had higher prices at the time of delivery. Therefore, unless penalty liabilities for non-delivery were included in the level of security to be furnished, there was nothing to stop an NGS from engaging in such practices; 2) the recommended decision's directed financial security standard was not consistent with the Public Utility Code or the PUC's regulations because it was not reasonably related to UGI's financial exposure in the event of an NGS default; and 3) the ALJ incorrectly concluded that UGI's tariff did not adequately incorporate the PUC's regulations at 52 Pa.Code § 62.111(c)(1) because the tariff predated the Code section.

■ The PUC denied all three exceptions explaining first that the evidence presented indicated that the penalties did not have any relation to costs that UGI would incur in the event of a default or bankruptcy of an NGS. "UGI presented us with no argument or authority that supports the proposition that penalties to be paid by an NGS are in any way 'reasonably related to the financial exposure' UGI would have in the event of an NGS default or bankruptcy." (PUC's July 9, 2004 decision at 11.) The PUC also explained that it agreed with the ALJ that the standard in determining the proper level of security was to "establish a range of exposure and then

establish a reasonable level of exposure within that range. After reviewing the evidence in this case, we also agree with the ALJ that UGI's model assumes 'the highest possible exposure under the worst imaginable circumstances.'" (PUC's July 9, 2004 decision at 13.) This appeal by UGI followed.[5]

Section 2208(c)(1)(i) of the Public Utility Code, 66 Pa.C.S. § 2208(c)(1)(i), provides the following regarding the furnishing of financial securing by an NGS:

(1) In order to ensure the safety and reliability of the natural gas supply service in this Commonwealth, no natural gas supplier license shall be issued or remain in force unless the applicant or holder, as the case may be, complies with all of the following:

(i) Furnishes a bond or other security in a form and amount to ensure the financial responsibility of the natural gas supplier. The criteria each natural gas distribution company shall use to determine the amount and form of such bond or other security shall be set forth in the natural gas distribution company's restructuring filing. In approving the criteria, commission considerations shall include, but not be limited to, the financial impact on the natural gas distribution company or an alternative supplier of last resort of a default or subsequent bankruptcy of a natural gas supplier. The commission shall periodically review the criteria upon petition by any party. The amount and form of the bond or other security may be mutually agreed to between the natural gas distribution company or the alternative supplier of last resort and the natural gas supplier

or, failing that, shall be determined by criteria approved by the commission.

■■■ UGI first contends that the PUC interpreted this provision incorrectly by concluding that the proper approach for determining an NGDC's financial security standard was to establish a range of exposure and then establish a reasonable level of exposure within that range because that approach is inconsistent with Section 2208(c)'s purpose of maintaining the reliability of Pennsylvania's natural gas supply. Because it is the responsibility of the NGDC, like itself, to ensure reliability of the natural gas supply, it points to 66 Pa.C.S. § 2202, which provides:

"Reliability." The term comprises adequacy and security. The term "adequacy" means the provision of sufficient volumes and deliverability of natural gas so as to supply the requirement of retail gas customers, taking into account **peak** and seasonal demands, as well as isolated market areas and system operation contingencies. The term "security" means designing, maintaining and operating a system so that it can safely handle **extreme conditions as well as emergencies.** (Emphasis added.)

Because this provision requires an NGDC to take into consideration peak demands and extreme and emergency conditions when selling a financial security, UGI then argues that the PUC's "reasonable" selection from a "range of exposure" over Shipley's limited two years of experience on UGI's system does not comply with this requirement.

While 66 Pa.C.S. § 2208(c)'s purpose is to furnish financial security to ensure the reliability of the natural gas supply, the

---

**5.** Our scope of review of the PUC's decision is limited to determining whether constitutional rights have been violated, whether an error of law has been committed, or whether findings of fact and conclusions of law are supported by substantial evidence. *Vertis Group v. Pennsylvania Public Utility Commission,* 840 A.2d 390 (Pa.Cmwlth.2003), *petition for allowance of appeal denied,* 580 Pa. 692, 859 A.2d 770 (2004).

operative subsection, (c)(1)(i), gives the PUC discretion to approve criteria to be used to determine the financial security necessary based upon financial impact on the NGDC by a default by an NGS. In implementing this provision, 52 Pa.Code § 62.111(c)(1) sets forth the criteria for a "reasonably related" financial security requirement to avoid discouraging alternative suppliers:

(c) The amount and the form of the security, if not mutually agreed upon by the NGDC and the licensee, shall be based on the criteria established in this section. The criteria shall be applied in a nondiscriminatory manner. The Commission will periodically review the established criteria upon petition by any party.

(1) The amount of the security should be **reasonably related to the financial exposure imposed on the NGDC or supplier of last resort resulting from the default or bankruptcy of the licensee.** At a minimum, the amount of security should materially reflect the difference between the cost of gas incurred and the supplier's charges, if any, incurred by the NGDC or supplier of last resort during one billing cycle.

(i) The amount of security established under this paragraph may be modified based on one or more of the following:

(A) The licensee's past operating history, including the length of time that the licensee operated on the NGDC's system, the number of customers served and past supply reliability problems;

(B) The licensee's credit reports;

(C) The number and class of customers being served.

(Emphasis added.) While 66 Pa.C.S. § 2202 requires the PUC to consider peak and seasonal demands as well as extreme conditions and emergencies, the PUC addressed this by concluding that the demands UGI presented were unrealistic and extreme. Additionally, the PUC's regulations allow it to determine the financial security based on whether it is *reasonably* related to the financial exposure imposed on the natural gas distribution company, and there was significant testimony offered that the financial security imposed by UGI was based on a worst case scenario which, again, was extreme. The PUC stated that it rejected UGI's worst case scenario as far as its financial security requirement because it was contrary to the intentions of the statute to promote competition and choice in the natural gas industry.

Because the PUC is the administrative agency charged with regulating utilities under the Code, and its expert interpretation of those issues is entitled to great deference unless clearly erroneous, *U.S. Steel Corporation v. Pennsylvania Public Utility Commission,* 850 A.2d 783 (Pa. Cmwlth.2004), and there is substantial evidence to support the PUC's decision, we will not substitute our discretion for the discretion of the PUC.

■ UGI also argues that the Commission abused its discretion by concluding that penalties should be excluded in calculating the appropriate financial security because the Public Utility Code imposes both the right and the obligation upon natural gas distribution companies to use penalties to preserve reliability. UGI contends that in the event of delivery default by Shipley, it will be harmed by inadequate financial security to pay any penalties it may have to pay as the provider of last resort.[6] UGI directs our attention to 66 Pa.C.S. § 2203, which provides:

---

**6.** Specifically, in its brief, UGI states: "UGI is          obligated to credit penalty amounts to its PGC

(12) The commission shall make its determinations pursuant to this chapter and shall adopt such orders or regulations necessary and appropriate to ensure that natural gas suppliers meet their supply and reliability obligations, including, but not limited to, *establishing penalties for failure to deliver natural gas* and revoking licenses ... (Emphasis added.)

UGI then points out that pursuant to 66 Pa.C.S. § 2205, it has the right to impose penalties:

Duties of natural gas distribution companies:

(a) Integrity of distribution system.

(1) Each natural gas distribution company shall maintain the integrity of its distribution system ... in a manner sufficient to provide safe and reliable service to all retail gas customers connected to its system consistent with this title and the commission's orders or regulations.

(2) In performing such duties, the natural gas distribution company shall implement procedures to require all natural gas suppliers to supply natural gas to the natural gas distribution company at locations, volumes, qualities and pressures that are adequate to meet the natural gas supplier's supply and reliability obligations to its retail gas customers and the natural gas distribution company's supply and reliability obligations to its retail gas customers. The procedures shall include, but not be limited to:

* * *

(iii) *the right to issue and enforce penalties* pursuant to the commission direction, provided, however, that the commission may approve additional procedures of like nature by order or regulation to preserve reliability. (Emphasis added.)

As the PUC found, UGI did not present any evidence that supported its proposition that penalties were in any way related to the financial exposure that UGI would have in the event of Shipley's default or bankruptcy, a necessary requirement for including it as an element of financial security under 66 Pa.C.S. § 2208(c)(1). Additionally, the PUC points out that under its regulations at 52 Pa.Code § 62.111 (relating to bonds or other security), there is no language regarding the inclusion of penalties in a calculation of security. For these reasons, the PUC did not abuse its discretion in not requiring Shipley to provide financial security for penalties.

Accordingly, the order of the PUC is affirmed.

### *ORDER*

AND NOW, this *7th* day of *July,* 2005, the order of the Public Utility Commission, dated July 9, 2004, is affirmed.

---

customer, and if it does not do so, it could face claims that it was imprudent in not obtaining financial security for these obligations, or that some or all of the financial security it does have should be directed towards credits to the PGC rather than meeting UGI's Section 2207(k) commodity cost." (UGI's brief at 27.)